COMMONWEALTH vs. BLACKGAMMON'S, INC. & another.[1]

Suffolk. June 9, 1980. — February 18, 1981.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, Standing to question constitutionality, Freedom of speech, Right to assemble. *License. Public Entertainment. Regulation. State Administrative Procedure Act. Boston. Boston Licensing Board.*

Coin-operated pool tables are subject to the licensing provisions of G. L. c. 140, § 177. [616-618]

The licensing provisions of G. L. c. 136, §§ 3 and 4, as applied to the operation of a "juke box," recorded music, and dancing by patrons of places of entertainment do not infringe on any rights guaranteed by the First Amendment to the United States Constitution or art. 16 of the Declaration of Rights of the Massachusetts Constitution. [621-622]

A defendant charged with offering entertainment on a Sunday by means of a "juke box," recorded music, and dancing for a fee without being licensed to do so as required by G. L. c. 136, §§ 3 and 4, did not have standing to argue that the licensing provisions infringed on the First Amendment rights of third persons. [622-623]

The provisions of G. L. c. 136, §§ 3 and 4, and the City of Boston Code, Ordinances, Title 14, §§ 426-428 and 430, as they affect the licensing of entertainment consisting of "juke box" music and dancing by patrons, provide constitutionally sufficient standards and guidelines. [623-624]

Pursuant to G. L. c. 140, § 21A, a city's licensing board had the authority to issue regulations relating to the granting or denial of licenses for the retail sale of soft drinks. [625]

The Boston licensing board is not an agency required to enact procedural rules under G. L. c. 30A, the State Administrative Procedure Act. [626]

Regulations promulgated by the Boston licensing board with respect to licenses for the retail sale of soft drinks, which were intended to be applicable to such sales by a business having the primary purpose of providing an establishment where patrons gather to socialize or enjoy some form of entertainment, did not constitute an infringement of

[1] Union Station, Inc.

First Amendment rights of sellers of soft drinks and were not so vague as to be unconstitutional on their face. [626-627]
Regulations promulgated by the Boston licensing board with respect to licenses for the retail sale of soft drinks were properly applied to operators of vending machines dispensing soft drinks who were duly licensed pursuant to the provisions of G. L. c. 94, §§ 308-312. [627-628]

COMPLAINTS received and sworn to in the Boston Municipal Court Department, one on October 27, 1978, and three on December 15, 1978.

After appeal to the jury session of the Boston Municipal Court Department, questions of law were reported to the Appeals Court by *Glynn*, J. The Supreme Judicial Court, on its own initiative, ordered direct review.

*Richard B. Michaud* for the defendants.

*Matthew L. McGrath, III*, Legal Assistant to the District Attorney (*Michael J. Traft*, Assistant District Attorney, with him) for the Commonwealth.

QUIRICO, J. The defendants are charged with operating places of business in the city of Boston without first obtaining licenses allegedly required therefor by various provisions of the General Laws, city ordinances, and regulations of the Licensing Board for the City of Boston. The cases are before us on an interlocutory report posing a number of questions concerning the constitutionality, validity and applicability of the statutes, ordinances and regulations involved. The report was originally made to the Appeals Court and was then transferred to this court on our motion.

The complaints involved in this case are the following:

(1) No. 790380, charging Union Station, Inc. (Union Station), with offering entertainment by means of a "juke box," recorded music, and dancing for a fee, on Sunday, November 12, 1978, without having a license therefor as required by G. L. c. 136, §§ 3 and 4;

(2) No. 790384, charging Union Station with keeping a place for the retail sale of soft drinks on November 24, 1978, without having a license therefor as required by the City of Boston Code, Ordinances, Title 14, §§ 426-430 (1975), adopted pursuant to G. L. c. 140, §§ 21A-21C;

(3) No. 790551, charging Blackgammon's, Inc. (Black-gammon's), with keeping a table for playing pool for a fee on October 9, 1978, without having a license therefor as required by G. L. c. 140, § 178; and

(4) No. 790602, charging Blackgammon's with offering entertainment by means of a "juke box", recorded music and dancing for a fee, on October 9, 1978, a weekday, without having a license therefor as required by the City of Boston Code, Ordinances, Title 14, §§ 426-430 (1975).

When these complaints first came to trial in the Municipal Court of the City of Boston, the defendants filed motions that the complaints be dismissed on the grounds that the various statutes, ordinances and regulations on which they were based were either unconstitutional, invalid or inapplicable. On February 9, 1979, the judge, in an opinion giving his reasons therefore, denied the motions as to these four complaints,[2] and found the defendants guilty of the offenses charged. The defendants then appealed for a trial in the same court before a jury of six persons. G. L. c. 218, § 27A, as appearing in St. 1978, c. 478, § 189. In the jury session the defendants renewed their earlier motions to dismiss the complaints, or filed new motions to that effect.[3] The jury session judge held an evidentiary hearing on these motions on March 30, 1979, but he made no decision thereon. He has instead held them under advisement pending the disposition of his interlocutory report of questions thereon to the Appeals Court. The report was entered in the Appeals Court on August 8, 1979, and transferred to

---

[2] In the same opinion, the judge ordered that certain other complaints which were based on G. L. c. 140, §§ 181-182, be dismissed by reason of the decision of a three-judge panel of the United States District Court in *Gallarelli* v. *White*, Civ. No. 73-2587-G, (Sept. 21, 1973) (unpublished), holding these sections unconstitutional. There is nothing before us as to the complaints thus dismissed.

[3] We cannot be more precise on this point because the motions, whether consisting of a renewal of the earlier ones, or the filing of new ones, are not reproduced in the record appendix. Neither can we state the contents of the motions except to the extent that they are described in the briefs of the parties.

this court on April 28, 1980. See G. L. c. 218, § 27A (*d*), as amended by St. 1979, c. 344, § 3; and Mass. R. Crim. P. 34, 378 Mass. 905 (1979).

The report states that "[t]here [are] now pending in the jury session of [the Boston Municipal Court] over 300 cases waiting trial by jury arising out of the same chain of circumstances alleged in the above-captioned cases." In view of these statistics, this is an appropriate situation for an interlocutory report. *Commonwealth* v. *Vaden*, 373 Mass. 397, 399-401 (1977). *Commonwealth* v. *Henry's Drywall Co.*, 362 Mass. 552, 554-557 (1972).

The interlocutory report places before us a series of six questions arising from the defendants' facial attack on the various statutes, ordinances, and regulations bearing on the licenses which were allegedly required to be obtained by the defendants. Although the judge held an evidentiary hearing on the motions to dismiss the complaints in question, we do not have the benefit of any findings of fact or statement of agreed facts with the report as originally filed, except for the following language in the report: "It is agreed between the parties, the Commonwealth and all the defendants, that the following facts are not disputed. The defendants operate places of entertainment in downtown Boston, including Sundays. The hours of operation began in the late evening hours and usually concluded at 6:00 A.M. Patrons enter the establishments after paying an admission fee. A number of activities are provided, including coin-operated pool tables and pinball machines, both for hire, juke boxes, and other recorded music, dancing and moving pictures. In addition, the patrons may purchase ice, soft drinks and other refreshments from the vending machines located on the premises.

"It is agreed that Blackgammon['s], one of the defendants, had applied in March, 1978 to the Licensing Board of the City of Boston for an entertainment license, which application was denied by the Licensing Board.

"None of the defendants [has] applied for an entertainment license since the enactment of the new ordinances [Ordinances, Title 14, §§ 426 through 430].

"The complaints allege that these businesses are being operated without several licenses required by law. It is the constitutionality of these requirements that is the subject matter of this report."

On March 31, 1980, the reporting judge allowed a motion of the defendants to enlarge the "record on appeal" by including therein the transcript of the hearing which he had held on March 30, 1979, on the motions to dismiss the complaints. Much of that transcript consists of an offer of proof of testimony and exhibits. The judge made no findings based on the proffered testimony and exhibits, and we make none. A small portion of the transcript records an oral stipulation of counsel to the effect "that neither Defendant had any license issued by the City of Boston or any of its agencies, and that the facts alleged in the various complaints are true . . . that Union Station actually did show movie pictures every day, and that both Defendants operated or had available for use coin-operated pool tables as part of an arcade consisting of a large number of coin-operated machines."[4]

---

[4] The transcript suggests that the parties were to file an additional written stipulation with the court. The suggestion of such a stipulation is in the following language:

THE PROSECUTOR: "Your Honor, we have an officer available, but [counsel for codefendant] said I may at least put in what the officers observed at Union Station and others that on the various nights there was dancing, there were movies without sound, that disco music was coming from speakers, that there were disc jockeys playing music on the public address system, juke boxes were playing, . . . coin-operated pool tables, and soda machines and food machines."

THE COURT: "May I suggest that you agree on some written memorandum to be given to me. I want to make this part of the record."

THE PROSECUTOR: "Yes, your Honor. That was in the totality of it, in any event, your Honor, but we will write that up."

COUNSEL FOR CODEFENDANT: "Okay."

". . . .

COUNSEL FOR CODEFENDANT: "Then, other than the fact that you have asked us to draw up the stipulation, I think that will conclude it."

Notwithstanding that colloquy, there is no such stipulation in the record before us.

This case is thus before us solely on the judge's interlocutory report which poses six specific questions in three groups by subject matter, and we limit this opinion to an attempt to answer the specific questions asked. The criminal complaints in question have not been tried, with the result that there is nothing before us by way of an appeal. With that statement of the proceedings to date, we turn to a consideration of the legal issues tendered.

1. *Standing of the defendants.* Notwithstanding the fact that the judge reported no question on the standing of the defendants to attack the constitutionality of the several statutes and ordinances involved in this case, both parties have argued this issue in their briefs. The Commonwealth contends that the defendants lack standing because of their failure, neglect, or refusal to apply for the licenses in question. The defendants counter with the argument that they have standing to mount a facial attack on the statutes without first submitting thereto by applying for licenses. There is no indication in the report or the accompanying record and transcript that this issue was raised before the judge who reported the interlocutory questions, and if it was, he did not report any question thereon. Therefore, this issue is not properly before us. Nevertheless, without intimating any opinion on that issue,[5] we pass to a consideration of the questions actually placed before us by the interlocutory report.

---

[5] In *Commonwealth* v. *Gordon,* 354 Mass. 722, 725 (1968), this court said, "The defendant never applied for a license, was never denied a hearing, and in no way was ever refused a license. 'Only one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object to the statute only as applied to him.' *Massachusetts Commn. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 390 [1962]. See *United States* v. *Raines,* 362 U.S. 17, 21 [1960], and cases cited. But in a prosecution for violation of a licensing statute which is unconstitutional on its face, the issue of its validity is presented even in the absence of an application for a license. *Smith* v. *Cahoon,* 283 U.S. 553, 562 [1931]."

For a discussion of the question whether the defendants have standing to assert claimed constitutional rights of their patrons, see *Broadrick* v. *Oklahoma,* 413 U.S. 601, 610-612 (1973).

2. *Pool table license.* Complaint No. 790551 charges that on October 9, 1978, Blackgammon's kept "a table for the purpose of playing at pool for hire, gain or reward," without having a license therefor. General Laws c. 140, § 177, as amended by St. 1964, c. 284, authorizes the licensing board of Boston and prescribed officials in other municipalities, to issue a license "to keep a billiard, pool or sippio table or a bowling alley for hire, gain or reward, upon such terms and conditions as they deem proper, to be used for amusement merely and not for the purpose of gaming for money or for property." It then prescribes procedures to be followed by the licensing authority in issuing such licenses. Section 178 imposes a fine on any person who "without such license keeps or suffers to be kept . . . a table for the purpose of playing at billiards, pool or sippio, or a bowling alley for hire, gain or reward."

The questions reported by the judge as to the pool table are the following:

"1. Does the fact that the pool tables located in the [defendant's premises] may be coin-operated, remove them from the purview of G. L. Chap. 140, sec. 177?

"2. Are such coin-operated pool tables subject to the licensing provisions of G. L. Chap. 140, sec. 177A and/or . . . sec. 181?"

For the reasons stated below, we answer the first question in the negative.

The licensing of pool tables and bowling alleys for hire was first delegated to cities and towns by St. 1857, c. 194. That delegation has continued to this day in language which is basically similar to that now contained in G. L. c. 140, §§ 177 and 178.[6] In *Commonwealth* v. *Kinsley*, 133 Mass. 578, 579 (1882), where the defendant was convicted of

---

[6] Much earlier the Legislature had provided by statute "[t]hat no taverner, innholder, or victualler, shall have or keep in or about their houses, yards, gardens, or dependencies, any dice, cards, bowls, billiards, quoits, or any other implements used in gaming," on pain of a prescribed forfeiture. St. 1786, c. 68, § 5. See *Commonwealth* v. *Goding*, 3 Met. 130, 131 (1841).

keeping a pool table for hire after his license to do so had been revoked, this court stated: "The keeping of a pool table for hire is one of many things affecting the public morals, which the Legislature can either absolutely prohibit or can regulate, and one common form of regulation is by requiring a license." In *Marchesi* v. *Selectmen of Winchester*, 312 Mass. 28, 30 (1942), where the plaintiffs sought a writ of mandamus to compel the defendants to issue him a license to operate a bowling alley under G. L. c. 140, § 177, this court observed: "It has long been recognized in this Commonwealth that the keeping of premises for a public bowling alley may be forbidden or permitted under such supervision and control as the Legislature deems appropriate and necessary to protect the public safety, health and morals, so that such a place will not become a source of annoyance and disturbance to the public or a menace to the peace and good order of a community."

Against that backdrop of the historic origins of the licensing and control of pool tables kept for hire, and the judicial statements of reasons therefor, we turn now to the first question reported, viz., whether the fact that the pool tables in question may be coin-operated removes them from the purview of G. L. c. 140, § 177. Our answer is that it does not. The first action by the Legislature aimed toward requiring the licensing of "automatic amusement devices" generally was its enactment of St. 1949, c. 361, adding § 177A to G. L. c. 140. This came ninety-two years after pool tables were first required to be licensed by St. 1857, c. 194, which ultimately became and still is G. L. c. 140, § 177. The Legislature, knowing of the existence of § 177 when it added § 177A in 1949, did not expressly repeal or amend § 177. Rather, it left § 177 just as it was, its last prior amendment having been by St. 1920, c. 191. Later, fifteen years after having enacted § 177A, the Legislature took a new look at § 177 and amended it by adding a second paragraph thereto. St. 1964, c. 284. This amendment required the licensing authority to hold a public hearing on an application for an original license, and that notice thereof

be published and mailed to abutters and other specified neighbors. The 1964 amendment of § 177 is some indication that the Legislature did not then believe that the section had been superseded in 1949 by the enactment of § 177A. There is no inconsistency between §§ 177 and 177A, and there is nothing to require consideration of the question whether § 177 was impliedly repealed by the enactment of § 177A.[7]

Our answer to the first question is that the fact that the pool tables in question may be coin-operated does not remove them from the purview of G. L. c. 140, § 177.

We respectfully decline to answer the question whether "coin operated pool tables [are] subject to the licensing provisions of G. L. Chap. 140, sec. 177A and/or . . . sec. 181," for the reason that it does not appear that these sections are involved in Complaint No. 790551. The complaint clearly charges an offense in language taken from §§ 177 and 178, and not under either of §§ 177A or 181.

3. *"Juke-box" licenses.* Complaint No. 790380 charges Union Station with offering entertainment on a Sunday by means of a "juke box," recorded music, and dancing for a fee without being licensed to do so as required by G. L. c. 136, §§ 3 and 4. Complaint No. 790602 charges Blackgammon's with the same offense on a weekday, in violation of an ordinance of the city of Boston. As to each of these complaints, the question reported is: "In view of the guidelines as stated in [*Fitchburg* v. *707 Main Corp.*], 369 Mass. 748 (1976), do the statute and ordinance set out constitutionally sufficient standards and guidelines?" We shall consider the alleged Sunday and weekday offenses separately.

(a) General Laws c. 136, § 3, requires that everyone who "on Sunday offers to view, sets up, establishes or maintains,

---

[7] The question whether the holder of a license under § 177 for the keeping of a pool table for hire must also obtain a license under § 177A if the particular table is one which is coin-operated is not before us and we imply no opinion thereon.

. . . dancing or any game, sport, fair, exposition, play, entertainment or public diversion for which a charge in . . . [money or otherwise] is made for the privilege of being present thereat or engaging therein . . ." must have a license under either G. L. c. 128A, § 2, or G. L. c. 136, § 4.[8]

Section 4 (1) of G. L. c. 136, as appearing in St. 1969, c. 152, provides that the "mayor of a city or the selectmen of a town, upon written application . . . may grant, upon such reasonable terms and conditions as they may prescribe, a license to hold on Sunday" the activities listed in § 3, with certain conditions and exceptions; viz., "no license shall be issued for dancing for which a charge in the form of the payment or collection of money or other valuable consideration is made for the privilege of engaging therein"; no license may be granted for such activities before one o'clock in the afternoon, "and provided further, that such application [except one for athletic events] shall be approved by the commissioner of public safety . . . ."

Section 4 (2) permits the licensing of activities scheduled to occur before 1 P.M., "with the written approval of the commissioner of public safety and upon such reasonable terms and conditions as prescribed by him therein."

Section 4 (3) permits the "licensing authority, or the commissioner of public safety or his designee" to "revoke, cancel or suspend any license issued under this section upon evi-

---

[8] General Laws c. 136, § 3, as amended by St. 1971, c. 951, § 4, reads in full as follows:

"Whoever on Sunday offers to view, sets up, establishes or maintains, or attempts to set up, establish or maintain, or promotes or assists in such attempt, or promotes, or aids, abets or participates in offering to view, setting up, establishing or maintaining, or acts as proprietor, manager or person in charge of, dancing or any game, sport, fair, exposition, play, entertainment or public diversion for which a charge in the form of the payment of money or other valuable consideration is made for the privilege of being present thereat or engaging therein, and for which a license has not been granted under the provisions of section two of chapter one hundred and twenty-eight A or as provided in section four, shall be punished by a fine of not more than two thousand dollars."

General Laws c. 128A, § 2, deals with horse and dog racing.

dence that the terms or conditions of such license or provisions of law are being violated . . . ."

The city council of a city or board of selectmen of a town is authorized by § 4 (4) to determine fees for issuance of licenses within specified limits, and by § 4 (5) to "make regulations relative to the granting of licenses under this section and" to "revoke or amend them from time to time."[9]

---

[9] General Laws c. 136, § 4, as amended through St. 1974, c. 117, provides in part:

"(1) The mayor of a city or the selectmen of a town, upon written application describing the proposed dancing or game, sport, fair, exposition, play, entertainment or public diversion, except as provided in section one hundred and five of chapter one hundred and forty-nine, may grant, upon such reasonable terms and conditions as they may prescribe, a license to hold on Sunday dancing or any game, sport, fair, exposition, play, entertainment or public diversion for which a charge in the form of payment of collection of money or other valuable consideration is made for the privilege of being present thereat or engaging therein, except . . . [certain activities not involved in this case]; provided, however, that no such license shall be issued for dancing for which a charge in the form of the payment or collection of money or other valuable consideration is made for the privilege of engaging therein; and provided further, however, that no license issued under this paragraph shall be granted to permit such activities before one o'clock in the afternoon; and provided further, that such application, except an application to conduct an athletic game or sport, shall be approved by the commissioner of public safety . . . .

"(2) Licenses may be issued by the authorities designated in paragraph (1) to permit such activities before one o'clock in the afternoon, with the written approval of the commissioner of public safety and upon such reasonable terms and conditions as prescribed by him therein. The application for the approval of the proposed activity by the commissioner shall be in writing . . . .

"(3) The licensing authority, or the commissioner of public safety or his designee, may revoke, cancel or suspend any license issued under this section upon evidence that the terms or conditions of such license or provisions of law are being violated; provided, however, that said commissioner shall not revoke, cancel or suspend any license issued under paragraph (1) which he is not required by said paragraph to approve.

"(4) The city council of a city or board of selectmen of a town may determine fees for the issuance of licenses . . . .

"(5) The city council of a city and board of selectmen of a town may make regulations relative to granting of licenses under this section and may revoke or amend them from time to time."

Complaint No. 790380 is the only complaint before us which charges a violation of G. L. c. 136, § 3. That complaint specifies that the entertainment for which the defendant Union Station failed to secure a license was a "[j]uke box (so-called), recorded music and dancing." This court upheld the validity of the statute as applied to a "juke box" in *Mosey Cafe, Inc.* v. *Mayor of Boston*, 338 Mass. 207 (1958). The question now before us is thus whether the decision in *Mosey Cafe, supra*, must be overruled because the statute can no longer withstand constitutional scrutiny, or, alternatively, whether the different circumstances of this case require a different result.

The defendants contend that the statute is invalid because its licensing requirements extend to expression and conduct protected by the First Amendment to the Constitution of the United States, and that the lack of a "narrow, objective and definite standard" governing the granting of licenses renders the statute void for vagueness under *Fitchburg* v. *707 Main Corp., supra* at 752.

*Fitchburg* v. *707 Main Corp.*, 369 Mass. 748 (1976), involved an action brought to prohibit the operation of a motion picture theatre without a license, under an ordinance which required the licensing of public entertainments. There we stated: "A city or town may require that motion picture theatres be licensed. G. L. c. 136, § 4, and c. 140, § 181. Expression by means of motion pictures, however, is included within the free speech and free press guaranties of the First and Fourteenth Amendments to the Constitution of the United States. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U.S. 495, 502 (1952). *Brattle Films, Inc.* v. *Commissioner of Pub. Safety*, 333 Mass. 58, 60 (1955). A law which requires that the exercise of First Amendment rights be subject to license must contain narrow, objective and definite standards, or it is void for vagueness. *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 150-151 (1969), and cases cited." *Fitchburg, supra* at 752. We held the ordinance involved in that case facially invalid, as well as invalid as applied, because it failed to provide definite standards to limit the

broad discretion vested in city officials to grant or withhold licenses.

The present case differs from *Fitchburg* in that the types of entertainment which the complaint alleges the defendants offered to the public for a fee, without first obtaining a license to do so, are not to the same extent forms of expression protected by the First Amendment. These activities, as noted above, are the operation of a "juke box" and other playing of recorded music, and "dancing." It is apparent that the dancing involved here is not that of a performer, paid or otherwise, whose performance is presented for the entertainment of the public, cf. *Commonwealth* v. *Sees*, 374 Mass. 532 (1978), but recreational dancing by members of the public themselves. Concerning the playing of "juke boxes" and other recorded music, the statement of the court in *Mosey Cafe, supra,* is relevant: "If there are kept in mind the nature of the 'juke box' and the number of records which must be used in the course of a year, § 4 [of G. L. c. 136], rightly construed as to 'juke boxes,' cannot be construed to require more than an approval of the activity as such without relation to the content of the records which from time to time are in it available to be played." 338 Mass. at 211. Therefore, at least with respect to the complaint against Union Station which forms the basis for the present report, we find no infringement on First Amendment rights, or those guaranteed by art. 16 of the Massachusetts Declaration of Rights, which would require that the statutory scheme of G. L. c. 136, §§ 3-4, be declared invalid on its face.

The defendants contend that they have standing to raise the rights of third persons whose First Amendment and art. 16 freedoms may be impaired by the operation of the statute. Such an "exception from traditional rules of standing" has been applied to claims of facial overbreadth "in cases involving statutes which, by their terms, seek to regulate 'only spoken words'". *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 59-60 & n.17 (1976), quoting from *Gooding* v. *Wilson*, 405 U.S. 518, 520 (1972). However, in the context

of a vagueness challenge to a licensing requirement, the defendants have no standing to argue that c. 136, §§ 3-4, is unconstitutional as applied to others. *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n (No. 1)*, 374 Mass. 547, 555-557 (1978).

(b) *Weekday license.* The City of Boston Code, Ordinances, Title 14, §§ 426-428 (1975), requires that licenses be obtained for public entertainment on weekdays and regulates the issuance thereof; and § 430 imposes a penalty for offering such entertainment without first obtaining a license to do so. Pertinent portions of this ordinance are reproduced in the margin.[10] While this ordinance is similar in some

---

[10] City of Boston Code, Ordinances, Title 14, §§ 426-430 (1975):

"§ 426. The Mayor may . . . grant a license for theatrical exhibitions, public shows, public amusements, and exhibitions of every description, to be held upon weekdays only, to which admission is obtained upon payment of money or upon the delivery of any valuable thing, or in which, after free admission, amusement is furnished upon deposit of money in coin-controlled apparatus. The application for such license must be in writing and fully and specifically describe the conditions of the proposed exhibition, show, or amusement and the premises upon which the proposed exhibition, show, or amusement is to take place, to the extent that such conditions or premises would affect the public safety, health, or order. . . . . [as appearing in Ordinances 1973, c. 9].

"§ 427. The Mayor shall act upon every application for a license or renewal of a license within thirty days next following the date of the filing of said application; and if he shall fail to act upon any application within the thirty days next following the date thereof or such other time as may be prescribed by law, he shall forthwith upon demand of the applicant issue or renew such license [, unless he shall have determined that a hearing should be held to consider whether the application should be denied under § 428 and within such thirty-day period shall have given the notice specified in said section.] [The matter appearing in brackets was added by Ordinances 1978, c. 9, § 1, as approved August 18, 1978.]

"§ 428. The Mayor shall grant a license applied for under section 426, unless he specifically finds . . . that the granting of the license at the premises would lead to or cause an offense under any applicable law, code, or ordinance; or would lead to the creation of a nuisance or otherwise endanger the public health, safety, or order by

(a) unreasonably increasing pedestrian or vehicular traffic in the area in which the premises are located; or

(b) increasing the incidence of illegal or disruptive conduct in the area in which the premises are located; or

respects to the one at issue in *Fitchburg, supra,* it differs therefrom in that it contains, particularly in § 428, provisions which define and substantially narrow the area of the mayor's discretion to withhold a license. For this reason as well as the limited type and nature of the entertainment involved, cf. *Mosey Cafe, supra,* we hold that the ordinance is not void for vagueness. The failure of the defendants to apply for licenses under the ordinance renders it impossible for us to consider the constitutional sufficiency of the ordinances as applied to them. See *Eve Corp.* v. *License Comm'n of Worcester,* 372 Mass. 869 (1977).

We conclude that G. L. c. 136, §§ 3 and 4, and the City of Boston Code, Ordinances, Title 14, §§ 426-428 and 430, as they affect the licensing of entertainment consisting of "juke box" music and dancing by patrons, provide constitutionally sufficient standards and guidelines as stated in *Fitchburg* v. *707 Main Corp.,* 369 Mass. 748 (1976).

4. The final three questions reported relate to two sets of regulations adopted by the Licensing Board for the City of Boston, purportedly under the provisions of G. L. c. 140, §§ 21A-21D. These are the "Emergency Regulation" enacted July 25, 1978, effective August 1, 1978, and a regu-

---

(c) unreasonably increasing the level of noise in the area in which the premises are located; or

(d) otherwise significantly harming the legitimate protectable interests of the affected citizens of the city.

"No application shall be denied if the anticipated harm is not significant or if the likelihood of its occurrence is remote.

"The Mayor may impose conditions upon a license but said conditions may only relate to compliance with applicable laws or ordinances, or to public safety, health, or order, or to steps required to be taken to guard against creation of a nuisance or to insure adequate safety and security for patrons or the affected public. [Ordinances 1978, c. 9, § 2, struck out the previous § 428, and inserted the above quoted language.]

". . . .

"§ 430. Whoever offers to view, sets up, sets on foot, maintains, carries on, or otherwise assists in or promotes any such exhibition, show, or amusement without a license shall be subject to a fine of fifty dollars for each day on which such violation occurs or during which said violation continues."

lation entitled "Soft Drink Licenses," effective November 10, 1978. The questions are: (a) did the Licensing Board for the City of Boston in enacting these regulations properly exercise its authority under G. L. c. 140, § 21A, and G. L. c. 30A (the State Administrative Procedure Act); (b) do the regulations meet the constitutional requirements set forth in *Fitchburg* v. *707 Main Corp., supra,* and related cases; and (c) may these regulations, if otherwise valid, be properly applied to vending machines duly licensed pursuant to the provisions of G. L. c. 94, §§ 308-312.

a. Section 21A of G. L. c. 140, as appearing in St. 1979, c. 358, § 1, provides in part: "Cities and towns *may provide* by ordinance or by-law *for the licensing* of persons to keep open their places of business for the retail sale of . . . soft drinks, and may fix the fee for said licenses . . . except that in cities having licensing boards the *authority to provide for the licensing* of such persons and the fixing of fees therefor shall be vested in said licensing boards." (emphasis added). The defendants contend that while this statute confers power on the licensing board to grant or withhold licenses, it does not give the licensing board any power to issue regulations relating to the granting or denial of licenses. We disagree.

The express words of the statute, which grant to the licensing board "the authority to provide for the licensing of such persons," fairly imply that the authority to set standards for the issuance of licenses, consistent with the statute, is also given. Clearly, cities and towns, which by § 21A "may provide by ordinance or by-law for the licensing of persons" have authority to adopt such standards; in this context, the proviso which repeats the phrase "authority to provide for" licensing with reference to licensing boards, indicates that similar authority was necessarily implied. Cf. *Hathaway Bakeries, Inc.* v. *Labor Relations Comm'n,* 316 Mass. 136, 141 (1944). Such authority is consistent with the other statutory functions of the licensing board. See St. 1906, c. 291, § 4; St. 1907, c. 214, § 1; St. 1910, c. 383; *Boston Licensing Bd.* v. *Alcoholic Beverages Control Comm'n,* 367 Mass. 788, 794-796 (1975).

As to G. L. c. 30A, it is clear that the Licensing Board for the City of Boston is not an "agency" required to enact procedural rules under the State Administrative Procedure Act, G. L. c. 30A. *United Food Corp.* v. *Alcoholic Beverages Control Comm'n,* 375 Mass. 238, 242-243 (1978). *Boston Licensing Bd., supra* at 796.

b. Both regulations concern licenses for the sale of soft drinks, and both seek to narrow their coverage to certain classes of establishments which sell soft drinks. The Emergency Regulations exempt from the licensing requirements, "innholders, common victualers or druggists," "dealers whose principal business is the sale of groceries and meats or either . . .," "persons or legal entities whose principal business is the transportation of the public or the servicing of vehicles for transportation," and "any persons or legal entities who sell non-intoxicating beverages in a health care facility or in an office building during the business hours of the offices, or in a government building or in any tax-exempt building." The Soft Drink Licenses regulations, in a section entitled "Intent of the Board," stated: "The Board wishes to regulate only those establishments which . . . sell soft-drink beverages, whether over-the-counter or by vending machine, *as an adjunct to a business which has the primary purpose of providing an establishment where patrons gather in order to socialize and/or to enjoy some form of entertainment*" (emphasis in original). A set of exemptions similar to those in the Emergency Regulations follows.

The defendants contend that the professed focus of the regulations of the licensing board transforms the soft drink licensing scheme into an unconstitutional restraint upon the exercise of freedom of speech and of assembly. We do not agree.

The defendants have no ascertainable First Amendment rights which are infringed by the licensing of them as sellers of soft drinks. If the reverse were true, any person engaged in a business in the course of which two or more persons gather and converse might assert a right to freedom from regulation on its face unrelated to speech or expression.

Moreover, such an attenuated claim of infringement of First Amendment rights cannot support an additional claim of standing to raise the rights of third persons, here, the patrons whose rights of free speech and assembly would assertedly be impaired by the requirement that the defendants obtain licenses to sell soft drinks at their places of business. *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 59-61 (1976).

As no First Amendment rights are implicated, an application of the standard of *Fitchburg* v. *707 Main Corp., supra* at 752, that the regulations "must contain narrow, objective and definite standards, or . . . [be] void for vagueness," would be misplaced. In any event, we hold that the Soft Drink Licenses regulations, which were in effect at the time of the violation by Union Station alleged in Complaint No. 790384, are not so vague as to be unconstitutional on their face.

c. The final question asks whether the regulations, if valid, may be applied to vending machines duly licensed pursuant to the provisions of G. L. c. 94, §§ 308-312. Despite some doubt whether this question is properly before us in the absence of a statement of agreed facts, we believe that the correct answer is in the affirmative. The soft drink licensing statute, G. L. c. 140, §§ 21A-21D, seems to be aimed in part at the identification of the person or entity operating the business in question, and its location. The license required is not issued in gross for its exercise at any unidentified location. By contrast, the vending machine statute, G. L. c. 94, §§ 308-312, relates to licenses issued by the Commissioner of Public Health to an operator of such machines who may then place them at any location of his choice within the Commonwealth. He is required to keep a list of all locations where the machines are operated by him, but the license is not limited to any specified location. One statute is intended to regulate places where soft drinks are sold; the other displays a strong indication of concern for public health problems, and for that reason requires the identification and licensing of operators of vending ma-

chines dispensing food or beverage. One statute is adminis-
tered locally by each municipality, and the other is adminis-
tered by the Commonwealth's chief public health officer.

The soft drink statute was enacted in 1922, and the vend-
ing machine statute in 1963. The soft drink statute was
amended in certain respects in 1979 by St. 1979, c. 358,
without the addition of any exemption for vending ma-
chines licensed under G. L. c. 94, §§ 308-312. We do not
find in G. L. c. 94, §§ 308-312, any indication that the
Legislature intended by it to preempt the field of vending
machines for the Commissioner of Public Health. None of
the statutory concerns of the Commissioner of Public Health
in regulating vending machines relate to the character of the
establishments in which they are situated, or their impact
upon the surrounding community. We believe that the
legislation indicates the intention that the two licensing
schemes continue to coexist. Any doubt on this subject was
resolved by the Legislature in enacting St. 1979, c. 358, ef-
fective July 3, 1979, which redefined the "retail sale" of soft
drinks covered by §§ 21A-21D to include specifically soft
drinks sold through a vending machine.

The cases are remanded to the Municipal Court of the
City of Boston for further proceedings consistent with the
opinions expressed herein.

*So ordered.*