ATTORNEY GENERAL *vs.* THE TRAVELERS INSURANCE
COMPANY & another.[1]

Suffolk.   December 9, 1981. — March 24, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Insurance*, Health and accident, Mental health, Regulation.  *Constitutional Law*, Federal preemption, Impairment of contract.  *Statute*, Federal preemption, Severability.

The provisions of G. L. c. 175, § 47B, requiring the inclusion of mental health care benefits in policies of insurance are independently enforceable, and, therefore, severable from the provision of § 47B requiring the inclusion of mental health care benefits in employee benefit plans. [601]

Discussion of general principles pertaining to Federal preemption of conflicting State law.  [601-602]

The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (1976), does not preempt G. L. c. 175, § 47B, requiring the inclusion of mental health care benefits in policies of insurance.  [602-609]

The National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1976), does not preempt G. L. c. 175, § 47B, requiring the inclusion of mental health care benefits in policies of insurance, although a number of such policies insure plans mandated by collective bargaining agreements negotiated pursuant to the Federal act.  [609-614]

General Laws c. 175, § 47B, requiring the inclusion of mental health care benefits in policies of insurance, applied to certain policies issued before its effective date, January 1, 1976, which had been altered or renewed through change in premium or benefits after January 1, 1976, and required the insurers to provide benefits from the date of alteration under such policies; this application of § 47B does not violate the contract clause of the United States Constitution, art. 1, § 10. [615-617]

CIVIL ACTION commenced in the Superior Court Department on June 1, 1979.

---

[1] Metropolitan Life Insurance Company.

The case was heard by *Brady*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Jay Greenfield* (*Moses Silverman & Nancy Kilson* with him) for Metropolitan Life Insurance Company.

*Lane McGovern* for The Travelers Insurance Company.

*John T. Montgomery*, Assistant Attorney General, for the Commonwealth.

HENNESSEY, C.J.    General Laws c. 175, § 47B, specifies mandatory minimum mental health care benefits for Massachusetts residents, which must be included in any general insurance policy, accident or sickness insurance policy, or employee health care plan, if the policy or plan covers hospital and surgical expenses.[2] The principal question before

---

[2] General Laws c. 175, § 47B, inserted by St. 1973, c. 1174, § 2, provides that: "Any blanket or general policy of insurance described in subdivision (A), (C), or (D) of section one hundred and ten which provides hospital expense and surgical expense insurance and which is issued or subsequently renewed by agreement between the insurer and the policyholder, within or without the commonwealth, during the period this provision is effective, or any policy of accident and sickness insurance as described in section one hundred and eight which provides hospital expense and surgical expense insurance and which is delivered or issued for delivery or subsequently renewed by agreement between the insurer and the policyholder in this commonwealth during the period that this provision is effective, or any employees' health and welfare fund which provides hospital expense and surgical expense benefits and which is promulgated or renewed to any person or group of persons in this commonwealth while this provision is effective shall provide benefits for expense of residents of the commonwealth covered under any such policy or plan, arising from mental or nervous conditions as described in the standard nomenclature of the American Psychiatric Association which are at least equal to the following minimum requirements:

"(*a*)  In the case of benefits based upon confinement as an inpatient in a mental hospital under the direction and supervision of the department of mental health, or in a private mental hospital licensed by the department of mental health, the period of confinement for which benefits shall be payable shall be at least sixty days in any calendar year.

"(*b*)  In the case of benefits based upon confinement as an inpatient in a licensed or accredited general hospital, such benefits shall be no different than for any other illness.

"(*c*)  In the case of outpatient benefits, these shall cover, to the extent of five hundred dollars over a twelve-month period, services furnished (1) by

us is whether § 47B is preempted by either the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (1976, Supp. I 1977, & Supp. II 1978) (ERISA), or the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1976 & Supp. III 1979) (NLRA). In addition, the defendant insurance companies raise issues concerning severability, the effect of § 47B on policies issued before its effective date in 1976, and the applicability of the contract clause of the United States Constitution, art. 1, § 10. We conclude that the provisions of § 47B pertaining to insurance are not preempted, and that they are severable from a provision pertaining to employee benefit plans, which the parties have assumed to be preempted. We also conclude that § 47B applies to certain policies issued by the defendants before 1976, and that this application of the statute does not violate the contract clause.

The Attorney General brought this action for declaratory and injunctive relief to enforce § 47B against insurance companies that issue group insurance policies providing medical coverage to Massachusetts employees.[3] The parties stipulated that nearly all of the defendants' group policies

---

a comprehensive health service organization, (2) by a licensed or accredited hospital (3) or subject to the approval of the department of mental health services furnished by a community mental health center or other mental health clinic or (4) consultations or diagnostic or treatment sessions, provided that such services under this clause are rendered by a psychotherapist or by a psychologist licensed under the provisions of chapter one hundred and twelve. For purposes of this clause 'psychotherapist' shall mean a person fully licensed to practice medicine under the provisions of chapter one hundred and twelve, who devotes a substantial portion of his time to the practice of psychiatry."

[3] The defendants have not included the required benefits in certain policies issued outside Massachusetts that provide coverage for Massachusetts employees, and certain policies issued before January 1, 1976. (These will be discussed later in this opinion.) The parties stipulated that the defendants have included the required benefits in policies issued or renewed in Massachusetts after January 1, 1976, but the defendants reserved the right to challenge § 47B as applied to these policies. Thus the defendants are asserting the invalidity of the statute with respect to all policies of insurance, whether issued before or after January 1, 1976, inside or outside the Commonwealth.

covering Massachusetts employees insure welfare benefit plans subject to ERISA. In addition, a number of the policies insure plans mandated by collective bargaining agreements negotiated pursuant to the NLRA.

A Superior Court judge issued a preliminary order requiring the defendants to provide the mental health coverage described in § 47B. After trial, a second judge granted a permanent order to the same effect. We granted the defendants' application for direct appellate review.

1. *Severability.*

Although § 47B applies by its terms to "employees' health and welfare fund[s]," as well as to policies of insurance, the Attorney General has not enforced it against uninsured plans subject to ERISA. The present case involves only insurers, and all parties have assumed that direct enforcement against plans is preempted by ERISA. A threshold question, therefore, is whether the provisions of § 47B requiring the inclusion of mental health care benefits in policies of insurance are severable from the provision pertaining directly to benefit plans. We believe that they are. The insurance requirements "have independent force, thus justifying the inference that the enacting body would have passed one without the other." *DelDuca* v. *Town Adm'r of Methuen*, 368 Mass. 1, 13 (1975). The judge's findings indicate that many plans purchase insurance, and that § 47B as currently enforced (against insurers only) has brought about significant improvements in mental health care in Massachusetts. The judge also found that there was no credible evidence that partial enforcement of § 47B had caused plans to shift to self-insurance.

In light of our conclusion that the insurance provisions of § 47B are independently enforceable, the following discussion of preemption will be limited to the statute's application to policies of insurance.

2. *Preemption — General Principles.*

By the operation of the supremacy clause of the United States Constitution, art. 6, Federal law preempts conflicting State law. *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1,

210-211 (1824). The conflict may be direct, in the sense that State regulation contradicts Federal regulation, see *McDermott* v. *State*, 228 U.S. 115, 132-134 (1913), or interferes with Federal policy, see *Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973), or it may arise from congressional intent, express or implied, to exclude all State regulation from a particular area. See *Commonwealth* v. *Federico*, 383 Mass. 485, 489 (1981); *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522-525 (1981); *Chicago & N.W. Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U.S. 311, 324-326 (1981). See generally L. Tribe, American Constitutional Law 376-389 (1978). Preemption, however, is not favored, and State laws should be upheld unless a conflict with Federal law is clear. A finding of preemption must rest upon "persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Alessi* v. *Raybestos-Manhattan, Inc., supra* at 522, quoting from *Florida Lime & Avocado Growers* v. *Paul*, 373 U.S. 132, 142, amended in other respects, 373 U.S. 929 (1963).

3. *Does ERISA Preempt § 47B?*

Congress enacted ERISA in 1974 to protect the interests of beneficiaries of employee benefit plans. 29 U.S.C. § 1001 (1976). *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981). *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U.S. 359, 374-375 (1980). Prior Federal law[4] had preserved primary responsibility for regulation of benefit plans to the States. See *Malone* v. *White Motor Corp.*, 435 U.S. 497, 505-512 (1978). See generally Hutchinson & Ifshin, Federal Preemption of State Law under the Employee Retirement Income Security Act of 1974, 46 U. Chi. L. Rev. 23, 25-30 (1978). In its place, ERISA outlined a detailed system for Federal regulation of benefit plan administration. *Alessi* v. *Raybestos-Manhattan, Inc., supra* at 510.

---

[4] The Welfare and Pension Plans Disclosure Act of 1958, Pub. L. No. 85-836, 72 Stat. 997 (1958) (repealed 1974, 29 U.S.C. § 1031[a][1] [1976]).

ERISA applies to two types of benefit plan — "pension plans," which provide retirement benefits or deferred income;[5] and "welfare plans," which provide nonpension benefits including medical and hospital expenses.[6] *Wadsworth* v. *Whaland*, 562 F.2d 70, 74 (1st Cir. 1977), cert. denied, 435 U.S. 980 (1978). ERISA's regulatory provisions establish disclosure requirements and fiduciary standards applicable to both pension and welfare plans,[7] as well as funding and vesting requirements applicable only to pension plans.[8] Other sections of the act provide for enforcement and administration, and for national insurance against termination of pension plans. See generally Hutchinson & Ifshin, *supra* at 30-34.

ERISA also contains express provisions defining its preemptive effect on State law. Three provisions are relevant here. First, the act's general preemption clause states in sweeping terms that ERISA supersedes all State laws that "relate to" employee benefit plans.[9] This general clause, however, is followed by a savings clause that exempts any State law that "regulates insurance" from the preemptive effect of the act.[10] The savings clause is limited in turn by a

---

[5] 29 U.S.C. § 1002 (2) (1976).

[6] 29 U.S.C. § 1002 (1) (1976).

[7] 29 U.S.C. §§ 1021-1031 (reporting and disclosure); §§ 1101-1114 (fiduciary responsibility) (1976).

[8] 29 U.S.C. §§ 1051-1061 (participation and vesting); §§ 1081-1086 (funding) (1976).

[9] 29 United States Code §§ 1144 (a) (1976) provides in relevant part that: "Except as provided in subsection (b) of this section, the provisions of . . . [ERISA] shall supersede any and all laws insofar as they may now or hereafter relate to any employee benefit plan." The term "employee benefit plan" refers to both pension plans and welfare plans. 29 U.S.C. § 1002 (3) (1976).

[10] "Except as provided in subparagraph (B) [the "deemer" limitation discussed *infra*], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities." 29 U.S.C. § 1144 (b) (2) (A). This exemption is in accord with the McCarran-Ferguson Act, 15 U.S.C. § 1011-1015 (1976), which establishes a Federal policy in favor of State regulation

third clause which provides that a State may not "deem" that a benefit plan is an insurer subject to its insurance laws.[11]

The Attorney General argues that § 47B is a law that "regulates insurance," and is therefore exempted from preemption by ERISA's savings clause. The defendants argue that, because the purpose and effect of § 47B are to regulate benefits, it should not be saved from preemption as an insurance law.

Persuasive authority supports the Attorney General's position. Both the United States Court of Appeals for the First Circuit and the Supreme Court of New Hampshire have rejected preemption challenges to a New Hampshire law nearly identical to § 47B.[12] *Wadsworth* v. *Whaland*, 562 F.2d 70 (1st Cir. 1977). *Metropolitan Life Ins. Co.* v. *Whaland*, 119 N.H. 894 (1979). The defendants suggest that these decisions are not soundly reasoned, and have been undermined by a recent decision of the United States Supreme Court, *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981). We disagree. In light of the *Alessi* decision, however, we will set forth our reasoning in some detail.

We first address the language of ERISA's preemption and savings provisions, to determine whether Congress has "unmistakably . . . ordained" preemption of § 47B. *Id.* at 522,

---

of insurance. See *SEC* v. *National Sec., Inc.*, 393 U.S. 453, 458-460 (1969); *Wadsworth* v. *Whaland*, 562 F.2d 70, 78 (1st Cir. 1977), cert. denied, 435 U.S. 980 (1978).

[11] "Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." 29 U.S.C. § 1144 (b) (2) (B) (1976).

[12] Like § 47B, the New Hampshire statute, N.H. Rev. Stat. Ann. § 415:18-a (Supp. 1979), requires insurers to include minimum mental health care benefits in all group policies covering hospital or medical expenses. The New Hampshire law does not apply directly to employee benefit plans, as does § 47B. As we have noted, however, the provision in § 47B for direct regulation of benefit plans is not before us.

quoting *Florida Lime & Avocado Growers* v. *Paul,* 373 U.S. 132, 142, amended in other respects, 373 U.S. 929 (1963). In *Alessi,* the Supreme Court adopted a broad construction of ERISA's general preemption clause, holding that the clause applied to a New Jersey workers' compensation law that prohibited set-offs of workmen's compensation payments against pension benefits. The Court reasoned that the New Jersey statute was a law "relat[ing] to" pension plans because it foreclosed a method of calculating pension benefits. 451 U.S. at 524-525. The Court added that "[i]t is of no moment that New Jersey intrudes indirectly, through a workers' compensation law rather than directly, through a statute called 'pension regulation.'" *Id.* at 525. See also 29 U.S.C. § 1144 (c) (2) (1976).

The Court's analysis in *Alessi* suggests that § 47B is a law that "relate[s] to" benefit plans, within ERISA's general preemption clause. Because a plan that purchases insurance has no choice but to provide mental health care benefits, the insurance provisions of § 47B effectively control the content of insured welfare benefit plans. Although grounds of distinction may exist between *Alessi* and the present case,[13] the Attorney General has not pressed them, and we treat § 47B as a law that "relate[s] to" employee benefit plans. See *Commonwealth* v. *Federico,* 383 Mass. 488 (1981).

This brings us to the savings clause, which exempts "any law of any state which regulates insurance." 29 U.S.C. § 1144 (b)(2)(A) (1976). The defendants insist that § 47B is not an insurance law, becuase it is designed to promote public health,[14] rather than to regulate "traditional" sub-

---

[13] *Alessi,* which involved State regulation of matters within the scope of ERISA's regulatory provisions (see *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U.S. 504, 514-521 [1981]), does not necessarily undermine the reasoning expressed in *Gast* v. *State,* 36 Or. App. 441, 452-459 (1978). See *Alessi, supra* at 525 n.21.

[14] The public health objectives of § 47B are described at length in the trial judge's findings, and are documented in a postenactment report of the Joint Committee on Insurance. General Court, Joint Committee on

jects of State insurance. The language of the savings clause, however, is not limited to "traditional" insurance laws, even if such a category could be defined. Contrast *Commonwealth* v. *Federico,* 383 Mass. 485 (1981) (savings clause for "generally applicable" criminal laws). The only express limit on the savings clause is the third clause, sometimes called the "deemer" clause, which prevents States from deeming plans to be insurers. See *Wadsworth* v. *Whaland,* 562 F.2d 70, 77-79 (1st Cir. 1977); *Metropolitan Life Ins. Co.* v. *Whaland,* 119 N.H. 894, 902 (1979). On the other hand, we cannot agree with the Attorney General's contention that our analysis should end with the deemer clause. In the Attorney General's view, if § 47B applies to insurance, and does not treat plans as insurers, it is not preempted. See *Wadsworth* v. *Whaland, supra* at 77-78; *Metropolitan Life Ins. Co.* v. *Whaland, supra* at 902. We are wary of such a literal reading, which might permit the State, through its ·insurance laws, to reach far into areas governed by ERISA, and thereby negate the unmistakable intent of Congress to work a broad preemption. The deemer clause is one indication of the intended breadth of the savings clause, but we do not accept it as determinative. We conclude only that the language of the savings clause is broad enough to permit a construction that would exempt § 47B from preemption. Beyond this, the term "insurance law," and the wording of the deemer clause are of little help.

We prefer to resolve the tension between the general preemption clause and the savings clause by reference to the policies and operation of ERISA, and the general principle that preemption should not be implied unless there is a clear conflict between State and Federal law. *Chicago & N.W. Transp. Co.* v. *Kalo Brick & Tile Co.,* 450 U.S. 311, 317-318 (1981). *Jones* v. *Rath Packing Co.,* 430 U.S. 519, 525-526 (1977). Congress, when it enacted ERISA, was

Insurance, Advances in Health Insurance in Massachusetts (August, 1974). See note 24, *infra.*

concerned with widespread abuses in plan administration, often resulting in employees' losses of anticipated benefits. 29 U.S.C. § 1001 (a) (1976). *Wadsworth* v. *Whaland, supra* at 73-74. See *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U.S. 504, 510 (1981). In response, Congress enacted rules governing disclosure and fiduciary conduct by administrators of welfare benefit plans.[15] 29 U.S.C. §§ 1001 (b), 1021-1031, 1101-1114 (1976). Section 47B has no bearing on the problem of administrative abuse, and does not overlap or interfere with the means chosen by Congress to deal with such abuse. Section 47B affects only the substantive content of plans — a subject completely untouched by ERISA's regulatory provisions. See *Gast* v. *State,* 36 Or. App. 441, 452-458 (1978). Therefore, nothing in the practical relationship between the two statutes calls for an implied limitation on the phrase "regulates insurance" that would exclude § 47B from the protection of the savings clause.

The defendants discern an additional "policy" in ERISA's preemption provisions. They suggest that Congress intended to designate an area of private self-determination with respect to choice of benefits, and to protect it from all State regulation. But the defendants have not identified persuasive evidence in the legislative history of an affirmative policy to curtail State police power in favor of private decision-making. See *Gast* v. *State, supra* at 457-458. To the contrary, comments during floor debates indicate that broad preemption language was favored in order to provide a clear line of demarcation and to deter States from enacting inconsistent laws on the periphery of ERISA's subject matter.[16] Nor does the Supreme Court's opinion in *Alessi, supra,*

---

[15] In the area of pension plans, Congress also established vesting and funding requirements. 29 U.S.C. §§ 1001 (c), 1051-1086 (1976).

[16] For example, Congressman John Dent, Chairman of the Subcommittee on Labor of the House Labor and Education Committee, commented that "[w]ith the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation." 120 Cong. Rec. 29197 (1974). Senator

support the defendants' view that Congress intended to establish strict protection of self-determination in an area outside the scope of ERISA's regulatory provisions. In fact, the Court emphasized in its discussion of preemption that the New Jersey law at issue affected a subject covered by ERISA.[17]

The defendants also contend that ERISA established a policy in favor of uniformity with respect to benefit plans, which would be undermined if States were permitted to impose varying requirements on the substantive content of

Jacob Javits, a member of the Senate Committee on Labor and Public Welfare, described the history of the broad general preemption clause in similar fashion: "Both House and Senate bills provided for preemption of State law, but . . . defined the perimeters of preemption in relation to the areas regulated by the bill. Such a formulation raised the possibility of endless litigation over the validity of State action that might impinge on Federal regulation, as well as opening the door to multiple and potentially conflicting State laws hastily contrived to deal with some particular aspect of private welfare or pension benefit plans not clearly connected to the Federal regulatory scheme." 120 Cong. Rec. 29942 (1974). Such statements simply do not reveal a calculated, affirmative design to extend the preemptive effect of ERISA far beyond the reach of the act's regulatory provisions, in order to create an area reserved to unhindered private ordering.

[17] The Court noted that ERISA permitted set-off techniques. *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U.S. 510, 524 (1981). In an earlier section of the opinion, devoted to interpretation of ERISA, the Court also suggested that Congress, by its acquiescence in a prior regulation of the Internal Revenue Service, had authorized the precise set-off technique prohibited by the New Jersey law. *Id.* at 517-521.

The defendants cite a statement in the Court's discussion of preemption by the NLRA, that "ERISA leaves . . . pension calculation techniques . . . to the discretion of pension plan designers." *Id.* at 525. They also quote out of context statements made in the first section of the opinion, which dealt with interpretation of ERISA. There, the Court asked "what defines the content of the benefit that, once vested, cannot be forfeited," and answered that "ERISA leaves this question largely to the private parties . . . . That the private parties, not the government, control the level of benefits is clear from the statutory language defining nonforfeitable rights." *Id.* at 511. At most, these statements suggest that private parties control the designation of particular benefits as nonforfeitable — a small area of self-determination well within the scope of ERISA's regulatory provisions (29 U.S.C. §§ 1051-1061 [1976], governing vesting of pension benefits).

plans. The defendants point out that businesses that employ workers in a number of different States would be unable to adopt standardized plans covering all of their employees. We are not persuaded by this argument. Congress undoubtedly contemplated a system of uniform, national regulation in the areas governed by ERISA. On the other hand, it specifically approved State regulation in the fields of insurance, banking and securities, and so could not have intended to mandate complete uniformity for the convenience of multi-State employers. Moreover, the judge below stated in his findings that the defendants had presented "no credible evidence that [diverse State mandatory benefit laws] would be any more complex or burdensome to interstate commerce than various other . . . multi-state regulatory schemes such as workmen's compensation laws."

In sum, there is no conflict between § 47B and the policies or operation of ERISA that calls for a narrow interpretation of the phrase "regulates insurance" in the savings clause of ERISA's preemption provisions. Therefore, we conclude that ERISA does not preempt § 47B.

4. *Does the NLRA Preempt § 47B?*

Congress enacted the NLRA in 1935 to combat industrial strife by encouraging collective bargaining on terms and conditions of employment. 29 U.S.C. § 151 (1976). The act protects employees' rights to organize and to engage in concerted activity, and defines unfair labor practices by employers and unions. See 29 U.S.C. §§ 157-160 (1976). Certain of the insurance policies issued by the defendants insure plans agreed to through collective bargaining,[18] and the defendants contend that the NLRA preempts application of § 47B to these policies.

The issue of preemption takes a different form under the NLRA from that under ERISA. The NLRA does not pro-

---

[18] In some cases, the underlying collective bargaining agreements specify particular benefits; in other cases, the agreements prescribe only the total amount of the employers' contributions. Our conclusion that the NLRA does not preempt § 47B applies to both forms of agreement.

vide expressly for preemption of State law, as does ERISA. Thus, the NLRA's preemptive effect must be discerned entirely by implication from the policies of the act. On the other hand, Congress clearly did intend, in enacting the NLRA, to mark off an area for autonomous private ordering by labor and management, free from most forms of regulation by either the National Labor Relations Board or the States. *Lodge 76, Int'l Ass'n of Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140 (1976) (hereinafter *Machinists*). *Local 24, Int'l Bhd. of Teamsters* v. *Oliver,* 358 U.S. 283, 295-296 (1959) (hereinafter *Oliver*). *NLRB* v. *American Nat'l Ins. Co.,* 343 U.S. 395, 404 (1952). Apart from the limits set by Congress, both the economic tactics used during negotiations and the substantive terms of the resulting agreement are "left 'to be controlled by the free play of economic forces.'" *Machinists, supra* at 140, quoting from *NLRB* v. *Nash-Finch Co.,* 404 U.S. 138, 144 (1971). Therefore, when labor and management agree upon subjects of mandatory bargaining, the terms of their agreement "themselves become expressions of federal law, requiring preemption of intrusive state law." *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U.S. 504, 526 (1981).[19]

Despite the breadth of its statements concerning the preemptive effect of collective bargaining agreements, the Supreme Court has recognized that Congress could not have

---

[19] The Supreme Court's preemption decisions under the NLRA fall into two categories. First, the Court has sometimes invalidated State action because it encroached upon the "primary jurisdiction" of the National Labor Relations Board over matters covered by the act. See, e.g., *San Diego Bldg. Trades Council* v. *Garmon,* 359 U.S. 236, 244-245 (1959) (State injunction of picketing as an unfair labor practice). A second line of decisions, including those discussed in the text above, is based on implied Congressional intent to reserve to private resolution certain matters not covered by the regulatory provisions of the act. See, e.g., *New York Tel. Co.* v. *New York State Dep't of Labor,* 440 U.S. 519 (1979); *Machinists,* 427 U.S. 132 (1976); *Oliver,* 358 U.S. 283 (1959). In this second group of decisions, the Court has determined that the NLRA protects both choice of economic tactics, see, e.g., *Machinists, supra,* and choice of substantive terms, see, e.g., *Oliver, supra,* from State regulations.

intended to preempt "all local regulation that touches or concerns in any way the complex interrelationships between employees, employers and unions; obviously, much of this is left to the States." *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978), quoting from *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 289 (1971). See *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston,* 384 Mass. 446, 472-473 (1981), cert. granted sub nom. *White* v. *Massachusetts Council of Constr. Employers, Inc.,* 455 U.S. 919 (1982). Accordingly, the Court has acknowledged a number of exceptions to NLRA preemption, each based upon the probability that Congress did not intend to displace a particular type of State regulation. Preemption will not be implied when Congress has indicated in other Federal legislation that State law should govern a certain area,[20] or when "the activity regulated [is] a merely peripheral concern of the [NLRA]." *San Diego Bldg. Trades Council* v. *Garmon,* 359 U.S. 236, 243 (1959).[21] The Court has also upheld State laws when "the regulated conduct touched interests . . . deeply rooted in local feeling and responsibility," *id.* at

---

[20] In *Malone* v. *White Motor Corp.*, 435 U.S. 497 (1978), the Court held that the NLRA did not preempt a State law governing pension funding, on the ground that a Federal statute, the predecessor of ERISA, demonstrated congressional intent to permit State regulation of the field. In *New York Tel. Co.* v. *New York State Dep't of Labor,* 440 U.S. 519 (1979), the Court relied heavily upon the Social Security Act of 1935 in upholding a State law granting unemployment benefits to striking workers from revenue collected in part from the struck employers. *Id.* at 536-544 (plurality opinion); *id.* at 547 (Blackmun, J., concurring).

[21] In *International Ass'n of Machinists* v. *Gonzales,* 356 U.S. 617 (1957), cited by the Court after the statement quoted in the text, *supra,* the Court held that a State contract action against a union for wrongfully expelling a member was not preempted. See also *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 173-175 (1978) (pregnancy benefits peripheral). The First Circuit, in *Wadsworth* v. *Whaland,* 562 F.2d 70, 79 (1st Cir. 1977), relied in part on the "peripheral concern" exception in holding that the NLRA did not preempt New Hampshire's mandatory mental health benefit statute, which is analogous to § 47B (see note 12, *supra*).

244,[22] and has suggested an exception for "local health or safety regulation[s]," *Oliver, supra* at 297.[23]

Section 47B affects health benefits, a subject of mandatory collective bargaining. See *Allied Chem. & Alkali Workers Local No. 1* v. *Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 159 (1971). It does not, however, regulate labor-management relations as such; its purpose is to protect public health,[24] and its method is regulation of insurers and insurance policies. Ordinarily, preemption depends upon the *effect* of State law upon NLRA policy, and the fact that a State law is enacted for neutral purposes and applies outside the employment relationship cannot save it from preemption. *San Deigo Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 244 (1959). *Oliver, supra* at 297.

---

[22] The Court has applied this exception in upholding State authority to entertain tort actions arising out of labor disputes. See, e.g., *Linn* v. *United Plant Guard Workers Local 114*, 383 U.S. 53, 60 (1966). But see *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 173-175 (1978).

[23] The Court has not actually applied this exception. It did, however, recognize the exception in a more recent decision involving a State law affecting the substantive terms of a collective bargaining agreement. *Malone* v. *White Motor Corp.*, 435 U.S. 497, 513 n.13 (1978).

[24] A report of the Joint Committee on Insurance of the General Court, incorporated into the findings of the judge below, demonstrates that the Legislature was concerned with the spread of mental illness among workers and among the poor. In the committee's view, mental health insurance programs would encourage community-based, out-patient care and decrease the need for institutionalization. "Mental illness strikes indiscriminately among young and old, rich and poor. A need therefore exists for all people to be safeguarded against the high and sometimes crippling costs of professional mental health care today." General Court Joint Committee on Insurance, Advances in Health Insurance in Massachusetts 9 (1974). The defendants point to the committee's statement that "the organized worker had a higher rate of mental illness than the rich," and suggest that the committee was specifically concerned with labor relations. This statement, however (which was simply a description of the results of a Yale study), as well as other references to "workers," simply indicates the Legislature's recognition of the impact of mental illness on members of the working classes. It does not reveal an intent to alter the relative economic positions of organized labor and management. Cf. Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972).

See *John Hancock Mut. Life Ins. Co.* v. *Commissioner of Ins.*, 349 Mass. 390, 400 (1965). See also *New York Tel. Co.* v. *New York State Dep't of Labor*, 440 U.S. 519, 550-551 (1979) (Blackmun, J., concurring, joined by Marshall, J.), 557-558 (Powell, J., dissenting, joined by Burger, C.J., and Stewart, J.). Nevertheless, the various exceptions described above suggest that the character and purpose of the State law may bear upon congressional intent to subordinate it to the NLRA's policy of free collective bargaining.

At least two of the exceptions recognized by the Court are relevant to the validity of § 47B. The first of these is the exception for public health laws, suggested by the Court's statement in *Oliver* that, "We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce." 358 U.S. at 297. (See note 23, *supra*.) Section 47B appears to us to be the type of permissible health regulation envisioned by the Oliver court. Section 47B is designed to solve a serious health problem, rather than to alter the bargaining positions of unions and employers. It is unlikely that Congress intended, by enacting the NLRA, to bind the hands of State Legislatures with respect to problems such as mental health. And because § 47B is addressed to a Statewide health problem not peculiar to employment relationships, its exemption will not open a door to State interference with the "free play of economic forces" between labor and management. See Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972).

A second indication that Congress did not intend the NLRA to preempt laws such as § 47B can be found in another Federal statute, the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1976). *Wadsworth* v. *Whaland*, 562 F.2d 70, 79 n.44 (1st Cir. 1977). *Metropolitan Life Ins. Co.* v. *Whaland*, 119 N.H. 894, 905-906 (1979). See *Malone* v. *White Motor Corp.*, 435 U.S. 497 (1978). See also note 20, *supra*. The McCarran-Ferguson Act establishes a congres-

sional policy in favor of State regulation of insurance, and provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." 15 U.S.C. § 1012 (b) (1976). Although the purposes and effect of § 47B extend beyond regulation of insurance as such, the statute operates upon insurance and insurance policies. The McCarran-Ferguson Act does not contain a limiting definition of the term "business of insurance," see *SEC* v. *National Sec., Inc.*, 393 U.S. 453, 460 (1969), and we do not believe that conflict between § 47B and the NLRA is serious enough to call for a narrow reading that would exclude § 47B from the act's protection.[25]

Finally, § 47B is not an absolute limit on the parties' freedom to negotiate the terms of employee health plans. The provisions of § 47B now before us apply to insurers. They do not mandate the inclusion of mental health benefits in employee plans unless the parties decide to purchase insurance. In view of the need to accommodate the "separate spheres of governmental authority preserved in our federalist system," *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522 (1981), we hesitate to extend the implied preemptive reach of the NLRA to such a law.

In sum, § 47B imposes some limits on the freedom of labor and management to bargain for health benefit terms, but does so only as an incident of the parties' decision to purchase insurance. At least two of the factors that the Supreme Court has identified as indicia of congressional intent to tolerate particular State legislation despite its effect on collective bargaining pertain to § 47B. Applying the principle

---

[25] The defendants point out that the McCarran-Ferguson Act provides that it should not be construed to affect the "application to the business of insurance of the [NLRA]." 15 U.S.C. § 1014 (1976). The most reasonable interpretation of this provision is that labor-management relations within insurance companies are subject to the NLRA. See *John Hancock Mut. Life Ins. Co.* v. *Commissioner of Ins.*, 349 Mass. 390, 398 (1965). The reading suggested by the defendants — that the implied preemptive effect of the NLRA extends to insurance regulation — is not a reasonable interpretation.

that an "exercise of federal supremacy is not lightly to be presumed," *id.*, quoting *Schwartz* v. *Texas*, 344 U.S. 199, 203 (1952), we conclude that the NLRA does not preempt § 47B.

5. *Application of § 47B to Policies Issued Before 1976.*

The defendants' final contention is that § 47B does not and cannot apply to certain policies issued before its effective date (January 1, 1976), under which termination or renewal is at the option of the policyholder. These policies either do not permit the defendants to refuse to continue coverage, or permit refusal in limited circumstances only. All of the policies, however, authorize the defendants to raise premium rates. The judge found that since January, 1976, the defendants have raised premium rates for almost all policies, and that in many instances the parties have altered benefit coverage as well. The judge ordered the defendants to provide the benefits required by § 47B under policies that were "issued prior to January 1, 1976, but . . . have been *altered or renewed through any change in premium or benefits*" (emphasis added). We interpret this order to require the defendants to provide benefits from the date of alteration under policies altered since January 1, 1976.

Section 47B applies by its terms to policies "issued or subsequently *renewed by agreement between the insurer and the policyholder*" after its effective date (emphasis added). We agree with the judge that "renew[al] by agreement" includes changes in benefits or premiums. A change in benefit coverage is in effect an agreement to a new policy, whatever the label applied by the parties. An insurer's decision to raise premiums presents a closer question; the insurer has not actually assented to continued coverage. Nevertheless, we believe that an insurer's adjustment of its compensation, coupled with the insured's acceptance of the new rates, amounts to renewal for purposes of § 47B. Section 47B is designed to enable as many Massachusetts residents as possible to receive mental health coverage. The provision limiting its application to policies newly issued or renewed is best read as a measure to ensure that insurance companies can adjust their rates to reflect the new risks imposed.

This application of § 47B does not conflict with the contract clause of the United States Constitution, art. 1, § 10. Although the Supreme Court has confirmed in recent decisions that the contract clause imposes substantial limits on the power of States to alter contractual obligations, it remains clear that the prohibition against impairment of contract is not absolute. See *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234 (1978); *United States Trust Co.* v. *New Jersey*, 431 U.S. 1 (1977). Private contract rights are subject to reasonable and necessary legislation in furtherance of important public interests, and legislative judgments concerning reasonableness and necessity are entitled to deference. *Allied Structural Steel Co.* v. *Spannaus, supra* at 244. *United States Trust Co.* v. *New Jersey, supra* at 22-23. The Supreme Court has approached issues arising under the contract clause by assessing the relative weight of the impairment and the State's interest in enacting the impairing legislation. See *Allied Structural Steel Co.* v. *Spannaus, supra* at 244-250.

The impairment wrought by § 47B is minimal. The defendants must provide insurance against a risk they did not assume in the original policies. The risk imposed by § 47B, however, does not affect the defendants retroactively; benefits are due only from the date on which the policies were issued or amended, and in no case before the effective date of the statute. Contrast *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181 (1978) (mandatory premium rebates); *Allied Structural Steel Co.* v. *Spannaus, supra* (increased pension liability). Moreover, the defendants' policies permit them to counteract the new risk by raising premium rates. Contrast *Allied Structural Steel Co.* v. *Spannaus, supra* at 246-247. Thus, the defendants — participants in a heavily regulated industry —[26] cannot complain of a serious interference with their reasonable expectations.

---

[26] See *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 250 (1978). See also G. L. c. 174-175F; *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 193 (1978).

The State interest supporting § 47B — protection of the public health — is an important one, and the means selected to further it are reasonable. Section 47B applies generally to all insurers that issue policies to Massachusetts residents. Contrast *Allied Structural Steel Co.* v. *Spannaus, supra* at 250. Its application to policies altered after January 1, 1976, is reasonable and necessary to accomplish its objective of ensuring broad mental health coverage. Exclusion of such policies would permit insurance companies to avoid much of the effect of future insurance laws at no cost, by entering contracts characterized as perpetual, while retaining the right to raise premium rates. Without determining the full extent to which the State's interest in a broad application of mandatory benefit laws would justify impairment of private contracts, we believe that it overrides the minimal private interests here at stake.

We conclude that the application of § 47B at issue is severable from the application of § 47B that the parties have assumed to be invalid, and is not preempted by ERISA or the NLRA. With respect to policies issued since January 1, 1976, the judge correctly ordered the defendants to comply with § 47B from the date of issuance. With respect to policies issued before January 1, 1976, and altered or renewed through any change in premium or benefits after January 1, 1976, the judge correctly ordered the defendants to comply from the date of alteration.

*Judgment affirmed.*