ARTHUR D. LITTLE, INC. vs. COMMISSIONER OF
HEALTH AND HOSPITALS OF CAMBRIDGE.

Middlesex.   April 4, 1985. — August 1, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

Administrative Law, Regulations, Rule making, Judicial review. Municipal
   Corporations, Regulations. Public Health, Hazardous substance.
   Hazardous Substance. Practice, Civil, Jury trial. Constitutional Law,
   Federal preemption, Impairment of contracts.

The commissioner of health and hospitals of Cambridge, in issuing a
   regulation pursuant to G. L. c. 111, §§ 31 and 143, prohibiting the
   testing, storage, transportation and disposal within the city of certain
   extremely toxic chemical warfare agents, was not subject to the require-
   ments of the State Administrative Procedure Act or otherwise required
   either to hold a hearing or to make specific findings of fact. [540-544]
A city's health regulation issued pursuant to G. L. c. 111, §§ 31 and 143,
   was of general application and future effect, and the fact that only a
   single entity was carrying on within the city the activity proscribed by
   the regulation did not impart an adjudicatory, rather than a regulatory,
   character to the issuance of the regulation. [542-544]
In an action challenging the validity of a municipal health regulation,
   the right to a jury trial, provided by G. L. c. 111, § 143, was waived
   by a party's failure to make timely demand. [544-545]
Discussion of the doctrine of Federal preemption as applicable to a
   municipal health regulation prohibiting the testing, storage, transporta-
   tion and disposal within a city of certain extremely toxic chemical warfare
   agents. [545-546]
On appeal from a judgment, upholding the validity of a health regulation of
   the city of Cambridge prohibiting the testing, storage, transportation and
   disposal within the city of certain extremely toxic chemical warfare
   agents, this court concluded that the city's regulatory power was not
   preempted by the United States Constitution's grant of war and defense
   powers to the Federal government, where nothing in the record suggested
   that the regulation would have more than a speculative and indirect
   impact on the national defense. [546-548]
Federal legislation authorizing and regulating chemical warfare research
   did not preempt the power of the city of Cambridge to issue a health
   regulation prohibiting the testing, storage, transportation and disposal

within the city of certain extremely toxic chemical warfare agents, in the absence of any congressional action which clearly conflicted with the regulation at issue or which indicated congressional intent to occupy this regulatory field to the exclusion of the States. [548-551]

A contract, authorized by Federal statute, between the United States Department of Defense and a private defense contractor did not have the effect, under the supremacy clause of the United States Constitution, of preempting a health regulation issued by a municipal official of the city in which the contractor intended to carry out its activities under the contract, prohibiting certain of these activities within the city. [551-552]

A party challenging the validity of a city's health regulation prohibiting the testing, storage, transportation and disposal within the city of certain extremely toxic chemical warfare agents had the burden of demonstrating, on the record, the absence of any conceivable ground on which a court might uphold the regulation. [553] LYNCH, J. dissenting.

Where, in an action challenging the validity of a city's health regulation prohibiting the testing, storage, transportation and disposal within the city of certain extremely toxic chemical warfare agents, the record did not show the regulation to be unreasonable, arbitrary, whimsical, or capricious, this court concluded that the issuance of the regulation was a valid exercise of the city's power under G. L. c. 111, § 143. [553-555] LYNCH, J., dissenting.

A health regulation of the city of Cambridge prohibiting the testing, storage, transportation and disposal within the city of certain extremely toxic chemical warfare agents was a reasonable and appropriate exercise of the city's police power and thus did not violate the contract clause of the United States Constitution by impairing the obligation of a contract between the Department of Defense and a private defense contractor which had intended to undertake in Cambridge various research and testing activities prohibited by the regulation. [555-557]

CIVIL ACTION commenced in the Superior Court Department on March 16, 1984.

The case was heard by *Robert J. Hallisey*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas B. Bracken (Richard T. Murphy, Jr.,* with him) for the plaintiff.

*Scott P. Lewis (Russell B. Higley, Birge Albright & Edward R. Gallagher* with him) for the defendant.

HENNESSEY, C.J. This is an appeal from a judgment, entered by a Superior Court judge, upholding the validity of a regulation issued by the commissioner of health and hospitals of Cambridge (commissioner). The regulation prohibits "[t]he testing, storage, transportation and disposal," within the city of Cambridge, of five highly toxic chemical warfare agents. Arthur D. Little, Inc. (ADL), has challenged the regulation, and the order enforcing it, on a variety of procedural and substantive grounds, contending that: (1) the regulation is invalid because it was issued without a hearing, and without specific findings of any threat to public health; (2) the judge below wrongly deprived ADL of its right to challenge the regulation and order through a trial by jury; (3) the regulation is preempted by the constitutional grant of war and defense powers to the Federal government; (4) the regulation is unreasonable, arbitrary, or capricious; and (5) the regulation violates the contract clause of the United States Constitution, art. I, § 10, cl. 1. We conclude, after examining each of these contentions in turn, that the regulation and order were validly promulgated, and constitute a permissible attempt by the city of Cambridge to protect the health and welfare of its inhabitants.

The facts as established by the materials submitted for the purposes of the summary judgment motions are as follows. In June, 1982, and September, 1983, ADL entered into contracts with the United States Department of Defense (DOD), which called for the testing of small quantities of chemical warfare agents. This testing was commenced in the fall of 1983 at ADL's Cambridge facility, known as Levins Laboratory. The laboratory was constructed and operated in full accord with all applicable Federal and State standards, including standards issued by the DOD. It is located adjacent to Route 2, and within several hundred feet of a busy commercial area and a residential neighborhood.

On March 13, 1984, the commissioner, pursuant to his authority under G. L. c. 111, §§ 31 and 143 (1984 ed.),[1] adopted

---

[1] The Legislature has conferred on the commissioner all powers granted to local boards of health under G. L. c. 111, §§ 31 and 143. St. 1976, c. 201, amending St. 1946, c. 108.

the regulation at issue here, which prohibits the "testing, storage, transportation and disposal," within city limits, of five chemical warfare agents being studied at the Levins Laboratory.[2] The regulation was to remain in effect until a Scientific Advisory Committee (SAC) study, and an "independent hazard assessment," of those chemicals were completed and reviewed. Also on March 13, the commissioner issued an order under G. L. c. 111, §§ 143 and 146 (1984 ed.), requiring ADL to "cease the storage and testing" of the chemicals listed in the regulation.

ADL promply filed a complaint in Superior Court in Middlesex County seeking a review of the commissioner's order under G. L. c. 111, § 147 (1984 ed.), and a declaration under G. L. c. 231A, § 1 (1984 ed.), that the regulation issued by the commissioner was invalid. Shortly thereafter, a judge enjoined the commissioner from enforcing the regulation. This injunction has been extended pending the resolution of the merits of ADL's complaint.

In June, 1984, a consulting firm hired by the city issued its "independent hazard assessment." This report contained a detailed scientific analysis "of the potential public hazards involved in experiments with chemical warfare agents" at ADL. The report refrained, however, "from characterizing . . . the

---

[2] The regulation, in its entirety, provides that "[t]he following materials are hereby determined to be highly toxic, and extremely hazardous in the event of an accident, to the public health and safety of the population of the City of Cambridge. The testing, storage, transportation and disposal of the following chemical materials is hereby prohibited within the City of Cambridge: 1. Soman-GD (nerve agent) 2. Sarin-GB (nerve agent) 3. VX (nerve agent) 4. Mustard-HD (blister agent) 5. Lewisite (blister agent). This regulation shall remain in effect until the Scientific Advisory Committee Study and an independent hazard assessment has been completed, and these recommendations have been reviewed by this office."

In an affidavit signed shortly after the regulation was issued, the commissioner summarized how some of the banned substances are characterized in Goodman & Gilman, The Pharmacological Basis of Therapeutics (6th ed.). "Sarin and Soman are listed as extremely toxic 'nerve gases' . . . [and] are among the most potent synthetic toxic agents known. They are lethal to laboratory animals in submilligram doses . . . . Mustard refers to sulphur and nitrogen mustard compounds . . . [which are] powerful local vesicants (blister agent[s]) . . . . Lewisite is listed as an arsenical war gas."

hazard as 'acceptable' or 'unacceptable' "[3] The SAC issued its report in September. Certain of its findings are set forth in detail in the margin.[4] In short, the SAC concluded that ADL's use of the chemicals listed in the regulation, "within the densely populated City of Cambridge," was "inappropriate," and that the risks involved in such research were "unacceptable." On September 18, 1984, following the submission of these two reports, the commissioner issued a second regulation and order reaffirming the ban on the use of the chemical agents under study at ADL.

The parties filed cross-motions for summary judgment in the Superior Court suit filed by ADL to test the validity of the regulation. On Febuary 27, 1985, by order of a Superior Court judge, judgment was entered on behalf of the commissioner, declaring the regulation valid and enforceable. ADL promptly filed a notice of appeal, as well as a motion for a stay pending appeal. The requested stay, first denied by the Superior Court, was granted on March 15, 1985, by a single justice of the Appeals Court. The commissioner then filed a petition for relief from the stay with a single justice of this court, under G. L. c. 211, § 3 (1984 ed.). The single justice reserved and

---

[3] The independent consulting firm explained its reluctance to characterize definitively the hazard as follows: "Perspective on what is acceptable involves comparison with other risks people are exposed to as well as consideration of other factors such as whether the risks are voluntary or involuntary and what benefits accompany the risk." In an affidavit submitted to the court prior to the publication of this report, a senior consultant concluded, as did the subsequent SAC report, that the accidental or intentional release of nerve gas into the environment "is very unlikely but not impossible." This assessment of the risk of release is also shared by the director of health and safety at ADL.

[4] The SAC found that "[a]n accident in which chemical warfare agents are released from the ADL facility is unlikely but not impossible. In the event of such a release, members of the general public might be located within range of lethal levels of such agents. . . . The benefits of research with these chemicals, in the opinion of the Committee, do not justify lethal risks to the general public. For this reason, the SAC believes that storage and testing of these chemical warfare agents within the densely populated City of Cambridge in the quantities and concentrations used by ADL is inappropriate. Furthermore, the majority of SAC members judge the risks associated with any such work to be unacceptable."

reported this petition to the full bench. The appeal on the merits, pending in the Appeals Court, was also transferred here. Thus both cases are now before us.

I. PROCEDURAL CHALLENGES.

ADL contends that its statutory and constitutional due process rights were violated, because the regulation was issued without a prior hearing, and without findings of fact based on substantial evidence. We disagree. The State Administrative Procedure Act (APA), G. L. c. 30A, §§ 1 et seq. (1984 ed.), is inapplicable to actions taken by the commissioner pursuant to G. L. c. 111, §§ 31 and 143. Nor does any other statute, or the Constitution, require a hearing or findings to support this exercise of the commissioner's rule making authority. Consequently, the regulation was issued in a procedurally adequate fashion.

First of all, we reject ADL's argument that the commissioner is subject to the procedural requirements of the APA. See G. L. c. 30A, §§ 2-7. General Laws c. 30A, § 1 (2), renders the APA applicable to administrative action by "any department, board, commission, division or authority of the state government or subdivision of any of the foregoing, or official of the state government." Because the responsibilities of the commissioner are "confined to the municipality," *United Food Corp.* v. *Alcoholic Beverages Control Comm'n*, 375 Mass. 238, 242 (1978), the requirements of the APA are inapplicable.[5] See also *Commonwealth* v. *Blackgammon's, Inc.*, 382 Mass. 610, 626 (1981); *Buteau* v. *Norfolk County Retirement Bd.*, 8 Mass. App. Ct. 391, 392 (1979).[6]

---

[5] *Nabhan* v. *Selectmen of Salisbury*, 12 Mass. App. Ct. 264 (1981), is not to the contrary. In that case the Appeals Court assumed, without deciding, that a local board of selectmen was an agency subject to the APA, but held that the hearing requirement of G. L. c. 30A, § 2, was inapplicable on other grounds. *Id.* at 273.

[6] Although ADL was not entitled to the public hearing afforded by G. L. c. 30A, § 2, we note that ADL was given substantial opportunity to comment on the adoption of the regulation. The record shows that the SAC welcomed ADL's participation in preparing its report, and that ADL was kept well informed of the course of the SAC's deliberations. Moreover, ADL representatives were heard by, or allowed to distribute material to, the SAC

395 Mass. 535 541

Arthur D. Little, Inc. *v.* Commissioner of Health & Hospitals of Cambridge.

Nor do we believe that G. L. c. 111, §§ 31 and 143, require either a hearing, *Board of Health of Franklin* v. *Hass*, 342 Mass. 421, 423 (1961); *Revere* v. *Blaustein*, 315 Mass. 93, 95 (1943), or specific factual findings. See *Moysenko* v. *Board of Health of N. Andover*, 347 Mass. 305, 307 (1964). Nothing in the language of either section supports a different interpretation. Section 31 provides that "[b]oards of health may make reasonable health regulations." The section further requires notice by publication, but does not require a hearing or findings. Section 143 prohibits the establishment in a city or town of trades which may be harmful to the public, "except in such a location as may be assigned by the board of health . . . after a public hearing has been held thereon." Nonetheless, the same section provides that the board of health may prohibit the exercise of harmful activity "in places not so assigned, in any event." The absence of any provision for adjudicatory procedures in this latter situation is dispositive. "[W]here the Legislature has employed specific language in one [portion of a statute], but not in another, the language should not be implied where it is not present." *School Comm. of Brockton* v. *Teachers' Retirement Bd.*, 393 Mass. 256, 263 (1984), quoting *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982).[7]

Finally, ADL claims that due process principles require that it be given a hearing, and that the regulation be supported by

---

on a number of occasions. For example, at the third meeting of the SAC, ADL representatives made a presentation on "Levins Laboratory construction, contract work currently being conducted, safety precautions, lethal dosages, and self imposed limit[s]" on the quantity of chemical agents present at the laboratory at any given time.

[7] ADL contends that *Moysenko* v. *Board of Health of N. Andover, supra*, and *Board of Health of Wareham* v. *Marine By-Prods. Co.*, 329 Mass. 174, 178 (1952), require both a public hearing and findings in cases such as this. We disagree. In *Moysenko* v. *Board of Health of N. Andover, supra*, we noted that the adoption of the § 143 order was preceded by a public hearing, but never suggested that such a hearing was required. In *Board of Health of Wareham* v. *Marine By-Prods. Co., supra* at 177, we explicitly refrained from deciding "to what extent, if at all, a board of health acting under § 143 is bound to make express findings of fact to support its order."

findings of fact based on substantial evidence. The argument is based on the ground that the regulation is targeted solely at ADL, and thus that the regulation is essentially adjudicatory in nature.

Although the requirements of the APA are inapplicable to the actions taken by the commissioner, the distinction set forth in that statute between "regulation" and "adjudicatory proceeding" is helpful in situations such as that before us now. See *Mullin* v. *Planning Bd. of Brewster*, 17 Mass. App. Ct. 139, 141-142 (1983). An "adjudicatory proceeding" involves a determination of the "legal rights, duties or privileges of specifically named persons." G. L. c. 30A, § 1 (1). On the other hand, a "regulation" includes "every rule, regulation, standard or other requirement of general application and future effect." G. L. c. 30A, § 1 (5). See, e.g., *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 716, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983); *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 486-487 (1973); *Cast Iron Soil Pipe Inst.* v. *State Examiners of Plumbers & Gas Fitters*, 8 Mass. App. Ct. 575, 586-587 (1979); *United States* v. *Florida E. Coast Ry.*, 410 U.S. 224, 244-246 (1973). The regulation at issue here, as the judge below concluded, "applies to the operations of other laboratories and defense contractors in the city and is not an adjudication of the rights of a particular party." We find no reason to disagree. The regulation here is one of "general application and future effect." G. L. c. 30A, § 1 (5). It "could not be fittingly described as intended simply to determine the particular legal interests of specifically identified persons." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils., supra* at 486. Cf. *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 717; *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491, 499 (1965). We note that this characterization of the commissioner's action is consistent with other cases decided under § 143, or its predecessor, which hold that such a rule "is not in the nature of an adjudication of a particular case, but of a general regulation of the trade or employment mentioned therein." *Moysenko* v. *Board of Health*

*of N. Andover, supra* at 307, quoting *Taunton* v. *Taylor,* 116 Mass. 254, 261 (1874). *Cochis* v. *Board of Health of Canton,* 332 Mass. 721, 725 (1955).

We recognize that ADL's use of the banned chemicals precipitated the action by the commissioner. Moreover, it is not disputed that ADL alone was conducting activity proscribed by the regulation. But the fact that ADL's research alone motivated the ban, and served to "illustrate the general problems, . . . could not have the effect of transforming the regulatory endeavor into an adjudicatory one." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils., supra* at 487. In a similar situation this court has upheld a § 143 regulation prohibiting the painting of trucks within the city limits. *Revere* v. *Blaustein,* 320 Mass. 81, 83 (1946). We noted that "no constitutional right of the defendant was impaired even if he were the only one affected by the regulatory action of the board." *Id.* Similarly, in *Milton* v. *Donnelly,* 306 Mass. 451, 460 (1940), we recognized that even "if the only billboard that could be affected by the enforcement of the by-law is that of the respondent, that circumstance alone would not render the by-law invalid." See *Boston Gas Co.* v. *Department of Pub. Utils.,* 387 Mass. 531, 536-537 (1982). *Massachusetts Gen. Hosp.* v. *Belmont,* 233 Mass. 190, 203-204 (1919).

Because we conclude that the commissioner's action was rule making, and not adjudication, ADL's contention that it is entitled to findings of fact, and a hearing, before adoption of the regulation is meritless. It is well established that "an agency is not . . . obliged to provide a statement of the reasons which support its adoption of a regulation." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 723 n.9. *Cambridge Elec. Light Co.* v. *Department of Pub. Utils., supra* at 490-491. Moreover, "[a]ny constitutional claim to a trial type hearing fails if the proceeding was . . . regulatory or legislative or political. . . . A regulation, like legislation, often increases costs or diminshes business expectations or even proprietary rights, but neither demands a prior confrontation resembling a lawsuit." *Id.* at 488. See also *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 323

n.20 (1984). *Bi-Metallic Inv. Co.* v. *State Bd. of Equalization of Colo.*, 239 U.S. 441, 445-446 (1915).[8]

ADL further contends that it was entitled to a hearing and findings before issuance of the order prohibiting further use of the specified chemicals. We disagree. General Laws c. 111, § 147, provides ADL with an adequate means of challenging an order issued pursuant to a regulation validly enacted under §§ 31 and 143. See, e.g., *Revere* v. *Blaustein*, 315 Mass. at 95; *Swansea* v. *Pivo*, 265 Mass. 520, 523 (1929). In addition, we have interpreted § 148 to provide for a "discretionary stay" of the order pending judicial review. *Board of Health of Franklin* v. *Hass, supra* at 426. Finally, § 150 provides for damages to the plaintiff in the event that the order is overturned. These "safeguards . . . at least satisfy, and may exceed, what is constitutionally required." *Id.*

ADL's final procedural challenge to the judgment below is premised on the ground that the trial judge wrongly deprived it of the right to a jury trial under G. L. c. 111, § 147 (1984 ed.). This contention is meritless. Section 147 provides, in pertinent part, that "[w]hoever is aggrieved by an order made under section one hundred and forty-three . . . may . . . file a petition for a jury in the superior court . . . and . . . may have a trial in the same manner as other civil cases are tried by jury." As the judge below noted, ADL failed to make a demand for a jury trial, either in its complaint or in any other timely fashion. See Mass. R. Civ. P. 38(b), 365 Mass. 800

---

[8] ADL cites *Penn Cent. Co.* v. *Department of Pub. Utils.*, 356 Mass. 478, 485 (1969), to bolster its argument that the regulation must be based on findings supported by substantial evidence. Our holding in that case is limited to circumstances where the regulation at issue may create "unfortunate conflicts between State and Federal interests." *Id.* We have since held that *Penn Cent. Co.* applies "only to extraordinary situations." *Cambridge Elect. Light Co.* v. *Department of Pub. Utils., supra* at 492. See *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 82-83 n.7 (1979). Other cases ciated by ADL require trial-type administrative procedures, but these are distinguishable because they all involve administrative action which is adjudicatory in nature. See *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph*, 19 Mass. App. Ct. 296, 302-304 (1985); *General Chem. Corp.* v. *Department of Envtl. Quality Eng'g*, 19 Mass. App. Ct. 287, 290 (1985).

(1974). According to rule 38 (d), "[t]he failure of a party to serve a demand . . . constitutes a waiver by him of trial by jury." See *Greenberg* v. *Greenberg,* 10 Mass. App. Ct. 827 (1980). We note that other courts have strictly enforced cognate demand requirements, even when the relevant statute, like § 147, expressly provides for trial by jury. See *Scharnhorst* v. *Independent School Dist. #* 710, 686 F.2d 637, 641 (8th Cir. 1982), and cases cited, cert. denied, 462 U.S. 1109 (1983). Consequently, ADL has waived its right to a trial by jury.[9]

II. SUBSTANTIVE CHALLENGES.

A. *Preemption.* ADL contends that the regulation is inconsistent with the Federal Constitution and Federal statutes, and thus that it is invalid under the supremacy clause of the United States Constitution. Art. VI, cl. 2. We consider this argument in light of two principles which have traditionally informed our preemption analysis. First of all, "[p]reemption . . . is not favored, and State laws should be upheld unless a conflict with Federal law is clear." *Attorney Gen.* v. *Travelers Ins. Co.,* 385 Mass. 598, 602 (1982) (*Travelers I*), vacated, 463 U.S. 1221 (1983), reaffirmed, 391 Mass. 730 (1984), aff'd sub nom. *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U.S. 724 (1985). See *Commonwealth* v. *McHugh,* 326 Mass. 249, 265-266 (1950); *Exxon Corp.* v. *Governor of Md.,* 437 U.S. 117, 132 (1978). State law is not preempted merely by reference to some vaguely defined Federal policy, or on the ground that Congress has enacted a statute which is tangentially relevant to the subject at issue. Instead, the plaintiff here is obligated to show preemption "with hard evidence of conflict . . . on the basis of the record evidence in this case." *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 81-82 (1979), quoting *Kargman* v. *Sullivan,* 552

---

[9] In light of the consequences of ADL's failure to demand a jury trial, we need not consider the commissioner's further arguments that ADL waived its right to a jury by acquiescing in a jury-waived trial assignment, or by moving for summary judgment. Nor need we decide what issues, if any, were left for jury determination once ADL admitted that it was storing and testing the prohibited chemical agents.

F.2d 2, 6 (1st Cir. 1977). Generally speaking, "a finding of no preemption is regarded as preferable because Congress can overrule it by appropriate legislation, while a finding of preemption cannot be changed by the states." *Agency Rent-A-Car, Inc.* v. *Connolly,* 686 F.2d 1029, 1038 (1st Cir. 1982). See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 216 (1983).

Secondly, this court, and the United States Supreme Court, have been particularly reluctant to overturn State laws which are "deeply rooted in local feeling and responsibility." *Travelers I, supra* at 611, quoting *San Diego Bldg. Trades Council* v. *Garmon,* 359 U.S. 236, 243-244 (1959). *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 174 (1978). This principle applies with special force to laws designed to protect the public health and welfare, a subject of "particular, immediate, and perpetual concern" to any municipality. 6 E. McQuillin, Municipal Corporations § 24.01 (3d ed. rev. 1980). In fact, according to an early decision of this court, *Vandine, petitioner,* 6 Pick. 187, 191 (1828), "[t]he great object of the city is to preserve the health of the inhabitants." Accordingly, municipal health and safety regulations, such as that at issue here, carry a heavy presumption of validity, and are only rarely preempted by Federal law. *Travelers I, supra* at 612. See *Malone* v. *White Motor Corp.,* 435 U.S. 497, 513 n.13 (1978). "The States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U.S. 724, 756 (1985), quoting *Slaughter-House Cases,* 16 Wall. (83 U.S.) 36, 62 (1873). *Huron Portland Cement Co.* v. *Detroit,* 362 U.S. 440, 442-443 (1960).

ADL argues that any regulation which interferes with the conduct of a DOD research program is preempted by the Constitution's grant of war and defense powers to the Federal government. For example, the Constitution provides Congress with the power to "provide for the common Defence," art. I, § 8, cl. 1, "[t]o raise and support Armies," art. I, § 8, cl. 12, and "[t]o make Rules for the Government and Regulation of the

395 Mass. 535                                                      547

Arthur D. Little, Inc. v. Commissioner of Health & Hospitals of Cambridge.

land and naval Forces," art. I, § 8, cl. 14. The Constitution further directs that the President "shall be Commander in Chief of the Army and Navy." Art. II, § 2, cl. 1. We agree with ADL that these provisions constitute an explicit constitutional commitment of the national defense to the Federal government. Nevertheless, we further recognize that not every regulation which has some incidental effect on a defense program is invalid under the supremacy clause. Cf. *DeCanas* v. *Bica,* 424 U.S. 351, 355 (1976) (State laws involving aliens are not "per se pre-empted" by exclusive Federal power over immigration); see also *Plyler* v. *Doe,* 457 U.S. 202, 228 n.23 (1982). Nothing in the record before us suggests that the commissioner's action would have anything more than a "speculative and indirect impact," *DeCanas* v. *Bica, supra,* on the national defense. Accordingly, we conclude that the regulation is not preempted by the Constitution's allocation of war and defense powers to the Federal government.

First of all, we reject ADL's contention that the regulation at issue impermissibly interferes with an integral part of an important national defense program. Nothing in the record suggests that the densely populated city of Cambridge is some-how uniquely suited to research on chemical warfare agents. Banning research on these chemicals within that city hardly requires the abandonment of the DOD's chemical warfare pro-gram. The DOD remains free to conduct its research elsewhere. Accordingly, the city of Cambridge has not attempted to dictate the scope of permissible strategic research, or otherwise to interfere with congressional power to "provide for the common Defence." Instead, it has merely taken the position that research on certain chemical warfare agents must be conducted, if at all, outside the city limits.

Nor are we persuaded by what the commissioner has termed "ADL's domestic domino theory." Even if the Cambridge reg-ulation alone does not substantially interfere with national de-fense, ADL asserts that other municipalities may enact similar prohibitions, and thus seriously hinder the DOD's ability to study chemical warfare agents. We believe that the scenario posited by ADL is far too "hypothetical," *Rice* v. *Norman Wil-*

*liams Co.,* 458 U.S. 654, 659 (1982), to warrant preemption. According to the record only one other city has even considered the problem, and there is no indication that it will respond as the city of Cambridge has. Moreover, as the judge below recognized, even if a significant number of municipalities did enact such regulations, the DOD would always be free to conduct such research on its military bases. See *McQueary* v. *Laird,* 449 F.2d 608, 612 (10th Cir. 1971) ("Federal Government has traditionally exercised unfettered control with respect to internal management and operation of federal military establishments").[10]

ADL next contends that the regulation at issue is preempted by Federal legislation authorizing and regulating chemical warfare research.[11] State law, including municipal regulations, can be preempted by an act of Congress if the State law "'conflicts with federal law or would frustrate the federal scheme, or [if] the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'" *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U.S. 724,

---

[10] The cases cited by ADL are primarily addressed to the scope of Federal immunity from private suits challenging military decisions, and are thus inapplicable here. See *McQueary* v. *Laird,* 449 F.2d 608 (10th Cir. 1971); *Luftig* v. *McNamara,* 373 F.2d 664 (D.C. Cir.), cert. denied, 387 U.S. 945 (1967). See also *Pratt* v. *Hercules, Inc.,* 570 F. Supp. 773, 802-804 (D. Utah 1982) (scope of derivative sovereign immunity afforded to defense subcontractor); *Concerned About Trident* v. *Schlesinger,* 400 F. Supp. 454, 482-483 (D.D.C. 1975) (political question doctrine), aff'd in part and rev'd in part sub nom. *Concerned About Trident* v. *Rumsfeld,* 555 F.2d 817 (D.C. Cir. 1976).

[11] The commissioner argues that the Federal Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq. (1982), indicates that Congress intended, with exceptions not applicable here, to permit State and local regulation of hazardous chemicals. Section 2617 (a) (1) of that statute provides that "[n]*othing in this chapter* shall affect the authority of any State or political subdivision of a State to establish or continue in effect regulation of any chemical substance, mixture, or article containing a chemical substance or mixture" (emphasis added). This section disposes of any preemption argument based on other provisions of TSCA, but does not, we conclude, obviate the possibility of preemption either by the Constitution's grant of defense powers to the Federal government, or by other Federal legislation regulating the manufacture, use, transportation or disposal of hazardous chemicals.

747-748 (1985), quoting *Allis-Chalmers Corp.* v. *Lueck,* 471 U.S. 202, 209 (1985). *Silkwood* v. *Kerr-McGee Corp.,* 464 U.S 238, 248 (1984). *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 216 (1983). In applying this analysis, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 206, quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).

ADL bases its preemption argument on several Federal statutes which we briefly summarize. In 10 U.S.C. § 2358 (1982), Congress authorized "the Secretary of Defense . . . [to] engage in basic and applied research projects that are necessary to the responsibilities of the Department of Defense in the field of basic and applied research and development and that relate to weapons systems and other military needs." See also 10 U.S.C.A. §§ 2302 et seq. (Supp. 1985) (controlling the authority of Secretary of Defense to contract for defense purposes). In 50 U.S.C. §§ 1511-1520 (1982), Congress set forth certain restrictions on the DOD's chemical and biological warfare programs. For example, § 1511 requires that the Secretary of Defense submit an annual report to Congress detailing the research conducted during the preceding year on "lethal and nonlethal chemical and biological agents." Section 1512 prohibits the expenditure of funds for the transportation, open air testing, or disposal of chemical warfare agents unless certain specified procedures are followed, while § 1516 prohibits the expenditure of funds "for the procurement of delivery systems specifically designed to disseminate" such materials, unless the President certifies that such procurement is essential to the national defense. Sections 1517 and 1518 prohibit, except in emergency situations, the disposal of chemical or biological warfare agents unless they have first been detoxified, and § 1520 regulates the use of human subjects for the testing of these weapons. Finally, we note that the Clean Water Act, 33 U.S.C. § 1311 (f) (1982), prohibits the discharge of any "chemical, or biological warfare agent . . . into the navigable waters."

The purportedly preemptive effect of these statutes does not require extended discussion. First of all, we fail to see how the challenged regulation "conflicts with federal law or would frustrate the federal scheme." *Metropolitan Life Ins. Co.* v. *Massachusetts, supra* at 2393. Certainly, there is no "conflict" in the sense that "compliance with both federal and state regulations is a physical impossibility." *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n, supra* at 204, quoting *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132, 142-143 (1963). Nowhere in the Federal scheme is there any requirement that ADL conduct research on the banned chemicals within the Cambridge city limits. Nor do we observe any "conflict" here in the sense that enforcement of the regulation "would frustrate the federal scheme." *Metropolitan Life Ins. Co.* v. *Massachusetts, supra* at 2393. In fact, there is no Federal scheme whatsoever which either promotes or encourages the research at issue here. Cf. 42 U.S.C. § 2013 (d) (1982) (purpose of Atomic Energy Act to "encourage widespread participation in the development and utilization of atomic energy"). In the absence of some "clear and manifest purpose" on the part of Congress to foster private research on chemical warfare agents, *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n, supra* at 206, we are unable to infer any conflict with the Federal statutory framework.

Finally, we do not see any indication in these statutes that Congress "sought to occupy the field" of chemical warfare regulation "to the exclusion of the States." *Metropolitan Life Ins. Co.* v. *Massachusetts, supra* at 2393. Only a few of the Federal statutory provisions cited by ADL even apply to parties other than the Secretary of Defense. See 33 U.S.C. § 1311 (f); 50 U.S.C. §§ 1517, 1518, 1520.[12] Of these, only one places restrictions on ADL's testing of chemical warfare agents. That statute, 50 U.S.C. § 1520, prohibits the use of

---

[12] Most of the other relevant statutes, such as 50 U.S.C. §§ 1511-1513, 1516, 1519, place restrictions on the expenditure of funds by the Secretary of Defense.

395 Mass. 535                                              551

Arthur D. Little, Inc. *v.* Commissioner of Health & Hospitals of Cambridge.

human subjects except under specified conditions. This isolated provision hardly constitutes congressional occupation of the field sufficient to warrant preemption. Cf. *Illinois* v. *General Elec. Co.,* 683 F.2d 206, 214 (7th Cir. 1982) (preemption warranted in light of "comprehensive scheme of federal regulation of atomic energy"), cert. denied sub nom. *Hartigan* v. *General Elec. Co.,* 461 U.S. 913 (1983); *Washington State Bldg. & Constr. Trades Council* v. *Spellman,* 518 F. Supp. 928, 931 (E.D. Wash. 1981) (same), aff'd, 684 F.2d 627 (9th Cir. 1982), cert. denied sub nom. *Don't Waste Washington Legal Defense Found.* v. *Washington,* 461 U.S. 913 (1983).

We recognize that Congress has plenary authority in exercising its war and defense powers. See *Ullmann* v. *United States,* 350 U.S. 422, 436 (1956); *United States* v. *Onslow County Bd. of Educ.,* 728 F.2d 628, 640-641 (4th Cir. 1984); *St. John's River Shipbuilding Co.* v. *Adams,* 164 F.2d 1012, 1015 (5th Cir. 1947). Nonetheless, it is also well established that a State court, before invalidating State laws, should be "thoroughly convinced" of the arguments in favor of preemption, "lest it discover later that it has retreated where the Federal government will not advance and has therefore been derelict in its duty." *Commonwealth* v. *McHugh,* 326 Mass. 249, 265-266 (1950). In the absence of any congressional action which clearly conflicts with the regulation at issue, and in the absence of congressional intent to occupy the field, we conclude that the regulation is not preempted by Federal legislation.

Finally, ADL suggests that a contract between the DOD and a private defense contractor, authorized by Federal statutes, preempts inconsistent local regulations. We agree that ADL's obligations under its contracts with the DOD, and under the regulation, are flatly inconsistent.[13] Compliance with both is

---

[13] The commissioner contends that the regulation does not conflict with ADL's contracts with the DOD, on the ground that the contracts themselves require that ADL "conform to all Federal, State and local laws and ordinances which apply to operations with toxic materials at the location of [the] facility." This contention is meritless. "[L]aws enacted after the execution of an agreement are not commonly considered to become part of the agreement unless its provisions clearly establish that the parties intended to incorporate subsequent enactments into their agreement." *Feakes* v. *Bozy-*

a "physical impossibility." *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n, supra* at 204. Nonetheless, this court has been unable to locate authority in this or any other jurisdiction which supports the proposition that a contract to which the Federal government is a party somehow constitutes Federal law for the purposes of the supremacy clause. In fact, relevant authority strongly suggests that Federal power does not extend that far. The United States Supreme Court recently held that the constitutional immunity of Federal instrumentalities from State taxation cannot depend on a "government functionary . . . changing a few words in a contract." *United States* v. *New Mexico,* 455 U.S. 720, 737 (1982), quoting *Kern-Limerick, Inc.* v. *Scurlock,* 347 U.S. 110, 126 (1954) (Douglas, J., dissenting). See *Baltimore & A. R.R.* v. *Lichtenberg,* 176 Md. 383, 393, appeal dismissed, 308 U.S. 525 (1939); Tribe, Intergovernmental Immunities in Litigation, Taxation & Regulation: Separation of Powers Issues in Controversies about Federalism, 89 Harv. L. Rev. 682, 710 (1976). Allowing the DOD to contract itself, as well as private defense firms, out of local health and safety requirements would seriously compromise the city's ability to protect its inhabitants. Moreover, it would constitute a grant of power to the executive branch which, in the absence of congressional authorization, is wholly inconsistent with our federalist system. See *Washington* v. *United States,* 460 U.S. 536, 546 (1983); *United States* v. *New Mexico, supra* at 737-738; Tribe, *supra* at 711. Accordingly, we agree with the judge below that the regulation is not preempted by the contracts between ADL and the Federal government.[14]

_____

*czko,* 373 Mass. 633, 636 (1977). *Mayor of Salem* v. *Warner-Amex Cable Communications Inc.,* 392 Mass. 663, 666-667 (1984). Nothing in the record before us reflects any such intention.

[14] ADL alludes in its brief to an argument based on the "implied constitutional immunity of the national government from state taxation and from state regulation." *Penn Dairies, Inc.* v. *Milk Control Comm'n,* 318 U.S. 261, 269 (1943). See generally C. Antieau, Modern Constitutional Law §§ 10.66 et seq. (1969). We note that such immunity does not generally extend to private contractors who agree "to furnish supplies or render services to the government." *Penn Dairies, Inc.* v. *Milk Control Comm'n,*

B. *Arbitrariness.* General Laws c. 111, § 143, authorizes the commissioner to prohibit activities that *"may result"* in a nuisance or be harmful to the inhabitants" (emphasis added). See *Waltham* v. *Mignosa,* 327 Mass. 250, 252 (1951) (activity "need not in fact be a nuisance . . . before the power of prohibition arises"). Construing this broad delegation of authority, we have held that regulations promulgated under § 143 may be struck down only if they are shown to be "unreasonable, arbitrary, whimsical, or capricious." *Moysenko* v. *Board of Health of N. Andover,* 347 Mass. 305, 308 (1964), quoting *Butler* v. *East Bridgewater,* 330 Mass. 33, 38 (1953). In mounting a challenge on these grounds, ADL "has the burden of proving on the record 'the absence of any conceivable ground upon which [the rule] may be upheld.'" *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 329 (1984), quoting *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980). See *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 722. "If the question is fairly debatable," we cannot substitute our own judgment for that of the commissioner. *Id.* at 722, quoting *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 136 (1949). See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 469 (1981). This deferential attitude "is necessary to maintain the separation between the powers of the Legislature and administrative agencies and the powers of the judiciary." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 723. Plenary review of administrative regulations "would have an unhealthy tendency to substitute the court for the agency as policymaker." *Id.* at 724, quoting *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 491 (1973).

Our reluctance to intrude too deeply into the administrative process is also grounded firmly on the principle that "the respective roles of the agency and the reviewing court should be

*supra.* See *Stewart & Co.* v. *Sandrakula,* 309 U.S. 94, 105 (1940). See also *United States* v. *New Mexico, supra* at 735 (immunity from State tax applicable only when "agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities").

worked out on the basis of full understanding of the comparative qualifications of each." 5 K.C. Davis, Administrative Law § 29:3, at 343-344 (2d ed. 1984) "[A]gencies may be relatively the experts on many problems of discretion or policy within the areas of their specialization." *Id.* This is undoubtedly the case with respect to the relative capabilities of this court and the commissioner in weighing the public health risks involved in ADL's testing of chemical warfare agents within the Cambridge city limits.

On the record before us, the plaintiff cannot meet its burden of showing the absence of any conceivable ground for the commissioner's action. Both the SAC and an independent consultant recognized that a release of hazardous chemical warfare agents from Levins Laboratory was either "unlikely" or "very unlikely," *"but not impossible"* (emphasis added). See notes 3 and 4, *supra.* The study conducted by the SAC concluded that the risks associated with the ADL research were "unacceptable." See note 4, *supra.* The other study refrained from making any such conclusion, asserting that "[p]erspective on what is acceptable involves comparison with other risks people are exposed to as well as consideration of other factors such as whether the risks are voluntary or involuntary and what benefits accompany the risk." See note 3, *supra.* From these reports, the conclusion is inescapable that the necessity for the regulation is, at the very least, "fairly debatable." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 722.

ADL notes that it made a "commitment" to use only a limited quantity of the chemicals at a single time, and thus argues that the SAC report is "wildly inaccurate" for failure to adjust its risk assessment accordingly. Even if ADL's "commitment" diminishes the risk posed by the research conducted at the Levins Laboratory, it does not affect other research institutions in Cambridge which may have had occasion to use the banned chemicals. As the judge below found, "[t]he regulation is aimed at the chemicals themselves and not merely at the ADL facility." Once the commissioner determined that the use of these chemicals, under some conceivable circumstances, would pose an unreasonable risk, he was under no duty to consider the

395 Mass. 535                                                555

Arthur D. Little, Inc. *v.* Commissioner of Health & Hospitals of Cambridge.

specific conditions at the Levins Laboratory before issuing his order of prohibition. *Moysenko* v. *Board of Health of N. Andover,* 347 Mass. 305, 307 (1964). See *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 727 n.19. See also *Weinberger* v. *Salfi,* 422 U.S. 749, 777 (1975) (statute need not "precisely filter[ ] out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute"). Under § 143, the commissioner is empowered "to prohibit the exercise of the trade or employment *as a whole whenever by any of the methods employed* it has become or may become a nuisance or otherwise offensive" (emphasis added). *Moysenko* v. *Board of Health of N. Andover, supra,* quoting *Board of Health of Wareham* v. *Marine By-Prods. Co.,* 329 Mass. 174, 178 (1952).

C. *Contract clause.* ADL next challenges the regulation on the ground that it violates the contract clause, U.S. Const. art. I, § 10, cl. 1, by impermissibly impairing ADL's contractual obligations to the DOD.[15] The regulation undoubtedly "worked a severe, permanent, and immediate change" in the relationship between the contracting parties. *Allied Structural Steel Co.* v. *Spannaus,* 438 U.S. 234, 250 (1978). See note 13, *supra.* Nonetheless, we conclude, because the regulation is a reasonable and appropriate exercise of the city's police power, that ADL's contract clause challenge is meritless. See *Exxon Corp.* v. *Eagerton,* 462 U.S. 176, 190-191 & n.12 (1983); *Energy Reserves Group, Inc.* v. *Kansas Power & Light,* 459 U.S. 400, 412 (1983).

"Literalism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *Allied Structural Steel Co.* v. *Spannaus, supra* at 240, quoting *W.B. Worthen Co.* v. *Thomas,* 292 U.S. 426, 433 (1934). Consequently, a regulation "does not violate the Contract Clause simply because it has the effect of restricting, *or even barring altogether,* the performance of duties created by contracts entered into prior

---

[15] Article I, § 10, cl. 1, provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."

to its enactment" (emphasis added). *Exxon Corp.* v. *Eagerton, supra* at 190. Instead, in reviewing regulations which substantially impair contractual obligations, we examine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the (regulation's)] adoption.'" *Energy Reserves Group, Inc.* v. *Kansas Power & Light, supra* at 412, quoting *United States Trust Co.* v. *New Jersey,* 431 U.S. 1, 22 (1977). The impairment need not be justified on the basis of "an emergency or temporary situation." *Energy Reserves Group, Inc.* v. *Kansas Power & Light, supra.* Instead, any "significant and legitimate public purpose" will suffice. *Id.* at 411.

On the basis of this authority, we conclude that the commissioner's action should be evaluated, under the contract clause, against essentially the same standard of reasonableness which we applied to ADL's challenge to the regulation as arbitrary or capricious. See *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 737-738. See also *Travelers I, supra* at 616. The standard is not a stringent one. "[U]nless the State itself is a contracting party," *Energy Reserves Group, Inc.* v. *Kansas Power & Light, supra* 412, we will defer to legislative or administrative judgment as to the wisdom of any particular measure. Any other rule would invite parties to enter into contracts to "estop the legislature from enacting laws intended for the public good." *Manigault* v. *Springs,* 199 U.S. 473, 480 (1905). *Exxon Corp.* v. *Eagerton, supra* at 190-191 & nn.11 & 12.

For the reasons set forth in our discussion of ADL's challenge to the regulation on the ground it is arbitrary or capricious, we conclude that the action taken by the commissioner constitutes a reasonable, and thus permissible, impairment of ADL's contractual obligations to the DOD. This is not a regulation aimed at "providing a benefit to special interests." *Energy Reserves Group, Inc.* v. *Kansas Power & Light, supra* at 412. Instead, the regulation imposes "a generally applicable rule of conduct," *Exxon Corp.* v. *Eagerton, supra* at 192, designed to protect all Cambridge citizens from what the commissioner

has concluded is an unacceptable risk. Because "the police power . . . is paramount to any rights under contracts between individuals," the regulation does not run afoul of the contract clause. *Allied Structural Steel Co.* v. *Spannaus, supra* at 241, quoting *Manigault* v. *Springs, supra.*

III. CONCLUSION.

We affirm the judgment of the Superior Court declaring the commissioner's regulation valid and enforceable. The stay of judgment pending appeal, granted in the Appeals Court, is vacated herewith.

*So ordered.*

LYNCH, J. (dissenting). In upholding the action of the commissioner in this case, the majority reaffirms the applicability of the rational basis test to administrative action.[1] As a result, if under any conceivable set of circumstances, no matter how remote, the necessity for the regulation is fairly debatable, the "inescapable" conclusion is that the regulation must be upheld. The majority reasons that any other result would violate the principle of separation of powers, and would fail to give due deference to the expertise of administrative bodies. *Ante* at 553-554.

It is my view that the rational basis test as traditionally applied in this Commonwealth rests upon the twin infirmities of misapplied precedent and illogic. It therefore should no longer be used as the litmus for judicial scrutiny of administrative regulations. That the regulation in this case passes scrutiny under the rational basis test illustrates beyond dispute the ineffectiveness of that test as a limitation on the abuse of power by administrative bodies. Therefore, even assuming that the majority has correctly characterized the commissioner's action

---

[1] The majority speaks of a "conceivable ground" necessary to validate the regulation, a test which is indistinguishable from the traditional rational basis test applied to legislative enactments. See, e.g., *American Family Life Assurance Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 477-478, cert. denied sub nom. *American Family Life Assurance Co.* v. *Hiam,* 464 U.S. 850 (1983).

as a regulation rather than a disguised adjudication,[2] I would not apply the rational basis test in determining the legality of that action. In my view, the rational basis test, as applied to administrative action, results not in the proper separation of powers, but in the abdication of meaningful judicial review. See *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 331 (1984) (Lynch, J., dissenting). Thus, I respectfully dissent from Part II B of the majority opinion. Because of the view that I take of this case, I would not reach the questions whether the procedure required by G. L. c. 111, § 31, was followed and whether the action of the commissioner was in fact adjudication within the meaning of G. L. c. 30A, §§ 1 (1) & 14.

1. *Flaws of the rational basis test.* The rational basis test arose out of a recognition of the principle that "acts, passed by the legislature, according to the forms prescribed in the Constitution, are founded in authority given by the people to that department." *Portland Bank* v. *Apthorp,* 12 Mass. 252, 253 (1815). Popularly elected representatives are accountable to the electorate, which provides a check on the arbitrary exercise of legislative power. For that reason, otherwise constitutional legislative action is not normally subject to intense judicial scrutiny. Indeed, it is our duty "to give effect to the will of the people as expressed in the statute by their representative body. It is in this way . . . that the doctrine of separation of powers is given meaning." *Shell Oil Co.* v. *Revere,* 383 Mass. 682, 687 (1981), quoting *Commonwealth* v. *Leis,* 355 Mass. 189, 202 (1969) (Kirk, J., concurring). See *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing,* 379 Mass. 368, 372 (1979).

---

[2] Although the regulation is couched in general terms, ADL is the only present or likely user of the banned chemicals, and the scientific studies allegedly supporting the regulation focus exclusively on the risks associated with ADL's research, and not on other problems that might arise if the chemicals were used in the future by some other business or individual. I also note that the regulation essentially renders wasted approximately $1 million spent by ADL to construct, with the knowledge and approval of the city of Cambridge, a special laboratory to conduct this research.

However, the infirmities of the test flow from its application to judicial review of administrative action. I cannot agree with the principle that a "regulation stands on the same footing as would a statute, ordinance, or by-law." *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 138 (1949). That logical leap, first taken by this court in *Druzik,* has been accepted and repeated as an article of faith, though its historical and philosophical justifications have never been probed. Indeed, the only support for the extension of this principle that was cited by the *Druzik* court was *Pacific States Box & Basket Co.* v. *White,* 296 U.S. 176, 186 (1935),[3] a case that is clearly no longer good law. See, e.g., 1 K.C. Davis, Administrative Law § 6.13, at 508; § 6.16, at 524 (2d ed. 1978).[4] While it may be easy to apply the same standard of review to legislative as to administrative action, to do so ignores material differences between the two.

Simply stated, "an agency is not a legislature." *State Farm Mut. Auto. Ins. Co.* v. *Department of Transp.,* 680 F.2d 206, 221 (D.C. Cir. 1982), vacated on other grounds, *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983). It is therefore "incorrect" to say that regulations have the "same legal force as do statutes." 1 F. Cooper, State Administrative Law 264 (1965). See 1 K.C. Davis, *supra* § 6.13, at 509. Instead, we should recognize that administrative bodies "have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories much as the concept of a fourth dimension unsettles our three-dimensional thinking. . . . [They] have been called quasi-legislative, quasi-executive or quasi-judicial, as the

---

[3] The *Druzik* court also cited *Fieldcrest Dairies, Inc.* v. *Chicago,* 122 F.2d 132, 135 (7th Cir. 1941), rev'd on other grounds, 316 U.S. 168 (1942), which itself relied on *Pacific States Box,* but only for the proposition that a municipal ordinance, not merely a regulation, stands on the same footing as a statute.

[4] The Supreme Court has since interpreted the language in *Pacific States Box* relied on by the *Druzik* court to mean only that administrative actions are entitled to a presumption of regularity. See *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 415 (1971).

occasion required, in order to validate their functions within the separation-of-powers scheme of the Constitution. The mere retreat to the qualifying 'quasi' is implicit with confession that all recognized classifications have broken down." *FTC* v. *Ruberoid Co.,* 343 U.S. 470, 487-488 (1952) (Jackson, J., dissenting). It is, however, not an impossible task to recognize the similarity of regulations to legislative enactments, while nevertheless taking due account of their differences. Blithely papering over these differences, as the rational basis test does, simply admits defeat in attempting to deal with a difficult problem.

It will not do to say only that the Legislature, comprised of directly elected representatives, has delegated its power to administrative bodies and theoretically provides some check on administrative abuse. First, administrative bodies are still one step removed from the electorate, the source of legislative power and the most potent check on its possible abuse. See *American Grain Prods. Processing Inst.* v. *Department of Pub. Health, supra* at 333 (Lynch, J., dissenting) ("administrative officials are only tangentially responsive to the will of the people"). Moreover, "policymaking by a small group of political appointees may be objectionally nonrepresentative," especially when no hearing and no formal opportunity to comment on proposed regulations takes place. L. Jaffe, Judicial Control of Administrative Action 566 (1965). Second, the plethora of State and local administrative bodies and the competing demands of other pressing legislation prevent effective legislative oversight. The Legislature does not have the opportunity "to examine more than an infinitesimal proportion of . . . regulations." DeLong, Informal Rulemaking and the Integration of Law and Policy, 65 Va. L. Rev. 257, 281 (1979). See Bruff, Legislative Formality, Administrative Rationality, 63 Tex. L. Rev. 207, 231-232 (1984). For these reasons, other courts have recognized that "agencies do not have quite the prerogative of obscurantism reserved to legislatures." *United States* v. *Nova Scotia Food Prods. Corp.,* 568 F.2d 240, 252 (2d Cir. 1977). Indeed, the Supreme Court has recently stated that it does "not view as equivalent the presumption of constitutionality afforded

395 Mass. 535                                                561

Arthur D. Little, Inc. v. Commissioner of Health & Hospitals of Cambridge.

legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co., supra* at 43 n.9. See *FCC* v. *RCA Communications, Inc.,* 346 U.S. 86, 90 (1953) ("Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body").

With the explosion of regulatory activity in the past twenty years, administrative bodies have become more independent, exercising more power at the same time that courts, at least in this Commonwealth, continued to adhere to only the most casual form of review. This situation has led to a perception that "agencies are out of control." Breyer, Reforming Regulation, 59 Tul. L. Rev. 4, 6 (1984). It has added fuel to "the growing popular disenchantment with the pervasive bureaucratization of economic and social life." Gellhorn & Robinson, Rulemaking "Due Process": An Inconclusive Dialogue, 48 U. Chi. L. Rev. 201, 260 (1981). These circumstances have called into doubt the "comfortable assumption that political remedies . . . may constitute an effective check" on administrative power, at the same time that it has become evident that administrative bodies are political, not neutral and disinterested, parties. DeLong, *supra* at 278, 281.

Despite these formidable practical and theoretical problems generated by assigning equivalence to statutes and regulations, this court has maintained its adherence to *Druzik.* Generally, the court has stated this theory of equivalence (upon which the rational basis test wholly rests) as an accepted fact, as though through simple repetition it could become so. See, e.g., *American Grain Prods. Processing Inst.* v. *Department of Pub. Health, supra* at 329; *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries,* 380 Mass. 471, 477 (1980); *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.,* 377 Mass. 282, 293-294 (1979); *Colella* v. *State Racing Comm'n,* 360 Mass. 152, 155-156 (1971). Alternatively, the court has relied on justifications that may support some degree of judicial deference, but in no way command the application of the rational basis test. For example, the court has justified the rational basis

test on the ground that the court "may not substitute its judgment for that of the Legislature." *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980). See *Borden, Inc.* v. *Commissioner of Pub. Health,* 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette,* 464 U.S. 936 (1983). Similarly, the court has based its use of the rational basis test on the avoidance of "an unhealthy tendency to substitute the court for the agency as policymaker." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 491 (1973). See *ante* at 553; *American Family Life Assurance Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 477-478, cert. denied sub nom. *American Family Life Assurance Co.* v. *Hiam,* 464 U.S. 850 (1983); *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 79-80 (1979); *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 853 (1977). As the previous discussion has illustrated, however, the idea that the Legislature has exercised any "judgment" is purely a legal fiction. Moreover, simply requiring that the administrative action be supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion" (the "substantial evidence" test), does not require this court to engage in judicial legislation or to substitute its views for those of the administrative body. This is obvious from a review of our cases applying the substantial evidence test, where this court has held that it will not substitute its view of the facts for that of the administrative body, *Arthurs* v. *Board of Registration in Medicine,* 383 Mass. 299, 304 (1981), nor decide what weight should be placed on particular facts, *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. 591, 602 n.5 (1984), nor set aside a choice "between two fairly conflicting views, even though the court would justifiably have made a different choice." *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n,* 386 Mass. 414, 420 (1982). We have noted that our review, even under the substantial evidence test, is a "limited" one, calling for "deference" to the administrative body's particular expertise. *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.,* 391 Mass. 238, 245-246 (1984). Indeed,

under the substantial evidence test we have explicitly held that "we may not substitute our judgment for that of the [administrative body]." *1001 Plays, Inc.* v. *Mayor of Boston*, 387 Mass. 879, 885 (1983). In light of these facts, it is evident that the only justification for the rational basis test is judicial precedent based on faulty premises.

2. *A proposed standard.* In developing a more appropriate standard of review of regulatory action, it is instructive to consider how the Federal courts have approached the same problem. Those courts, like the majority in this case, apply an "arbitrary or capricious" standard. However, Federal application of the arbitrary or capricious test bears little similarity to the test applied by the majority. From the lenient standard of *Pacific States Box,* which the majority still follows, Federal courts have evolved a much more substantial inquiry, subjecting regulatory action to "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc.* v. *Volpe, supra* at 415.[5] See *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co., supra* at 43.

This so called "hard look" standard of review "compares the agency's stated rationale for a decision with supporting or opposing data and policy views gathered by the agency as the 'administrative record' for judicial review. The court identifies the agency's value choices and checks their consistency with the factual basis asserted for them, the agency's other present or past policies, and the governing statute." Bruff, *supra* at 238. Similarly, Federal courts will "not supply a reasoned basis for the agency's action that the agency itself has not given" and actually relied on. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto Ins. Co., supra* at 43 & 50. This is in effect a rejection of the rational basis test as applied in this Commonwealth. That test, unlike the Federal test, validates any regulation so long as the imagination of some administrator, lawyer, or judge is fertile enough to envision a conceivable,

---

[5] Although *Overton Park* involved administrative action that was neither strictly regulatory nor adjudicatory, the principles of that case have been interpreted broadly so as to "revamp the law of informal rulemaking." DeLong, *supra* at 266.

though nonexistent, scenario, under which the regulation might possibly be labelled "rational."

The elements of the Federal test "do not significantly differ for purposes of judicial review of rulemaking" from the "substantial evidence" test with which this court already has developed familiarity. 1 K.C. Davis, Administrative Law § 6.6, at 468 (2d ed. 1978). See DeLong, *supra* at 287-288. See also *Associated Indus. of N.Y. State, Inc.* v. *United States Dep't of Labor,* 487 F.2d 342, 349-350 (2d Cir. 1973). Therefore, I would apply the substantial evidence test to review regulatory action.[6] It is neither radical nor unreasonable to require merely that administrative bodies base their regulations on "such evidence as a reasonable mind might accept as adequate to support a conclusion" (G. L. c. 30A, § 1[6]), "including any evidence that detracts" from it. *Craven* v. *State Ethics Comm'n,* 390 Mass. 191, 201 (1983), quoting *1001 Plays, Inc.* v. *Mayor of Boston, supra* at 885. Indeed, this court may have already begun to move in the direction of requiring something more from administrative bodies than "any conceivable basis." See *American Grain Prods. Processing Inst.* v. *Department of Pub. Health, supra* at 325 (finding a "substantial basis" for regulation); *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 725 (not relying on a rational basis because, after review of the record, the court found actual evidence warranting the regulation).

3. *The action in this case.* It is unmistakably clear that the commissioner's action is not supported by substantial evi-

---

[6] Of course, the test would operate somewhat differently in regulatory cases than in review of adjudicatory action. For example, the "evidence" necessary to support the rule would be provided in court, rather than established before the administrative body and would include whatever information the regulation's challenger and the administrative body choose to present in support of, or in opposition to, the rule. As in adjudicatory review, the initial burden of producing sufficient evidence to call into question the basis for a regulation would rest on the challenger. The administrative body would then have the usual choice of testing the challenger's evidence by a motion to dismiss (and appealing an adverse result), or by presenting its own case, and holding the challenger to its ultimate burden of persuasion that the regulation is unsupported by substantial evidence. Cf. *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. 591, 599-600 (1984).

dence.[7] His action is purportedly based on scientific studies conducted for the commissioner. But these studies were undertaken only *after* the commissioner had originally issued the chemical ban. It is not surprising that it was reissued almost verbatim after the studies were completed, because when "the decision is announced prior to [its justification] . . . the process is no longer one of investigation. There is an overwhelming institutional bias in favor of justifying the result in any way possible." *Independent U.S. Tanker Owners Comm.* v. *Lewis,* 690 F.2d 908, 920 (D.C.Cir. 1982).

Putting aside this consideration, the studies themselves also fail to provide substantial evidence for his action. First, these studies focused exclusively on ADL's research to establish the threat to public health involved. There was no consideration of, or reliance on, any other realistic scenarios concerning the possible use of the banned chemicals in Cambridge by the small number of other foreseeable users. Second, the conclusions of those studies are flawed on their face. They do not consider ADL's commitment to use significantly smaller amounts of the chemicals than the studies hypothesized. Thus, the studies are virtually useless in assessing even the "worst case" accident scenarios. When confronted with this fact, the commissioner has simply asserted that he did not have to consider ADL's commitment, since there was no guaranty that other users would make the same commitment. But the studies did not examine the hazards that might be posed by other users; they addressed themselves solely to ADL. It is neither reasonable nor rational for the commissioner to rely on the studies to support his action, but to deflect any criticism of the results

---

[7] I note that G.L. c. 111, § 31, requires the commissioner's regulations to be "reasonable" In *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.,* 391 Mass. 238, 245 (1984), we held that there is "no principled basis" for distinguishing between "substantial evidence," defined as evidence "a reasonable mind might accept as adequate to support a conclusion," and "reasonable support in the evidence." Thus, even without adopting the new general standard I have put forth, the commissioner's regulation should be reviewed under the substantial evidence test. To determine its validity under the rational basis test ignores the Legislature's choice of a stricter standard.

or methods chosen by shifting the focus to situations he has never considered.[8]

Nor was there sufficient information from which the commissioner could have made an informed judgment about the acceptability of the risk of harm from ADL's research. In general, "[t]he concept of overall risk incorporates the significance of possible adverse consequences discounted by the improbability of their occurrence." *City of N.Y.* v. *United States Dep't of Transp.,* 715 F.2d 732, 738 (2d Cir. 1983), cert. denied, 465 U.S. 1055 (1984). Quite apart from the commissioner's faulty knowledge about possible adverse consequences, he had no reasonable idea of the possibility that they would occur. Neither study considered the probability of a harmful accident except in the most general terms. While I would not require mathematical precision in making this assessment, something more is required than unsupported statements that it is "very unlikely" or "unlikely but not impossible." The quoted assessments offer the commissioner no support, since virtually anything could be considered by a reasonable person to be "not impossible."

The majority is correct in stating that we must give deference to the commissioner's expertise. *Ante* at 553-554. But "[*i*]*n judicial review, the court must evaluate the relevance and weight of expertness*" (emphasis in original). L. Jaffe, *supra* at 579. Unless "the requirements for administrative action [are] strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion" (emphasis in original). *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co., supra* at 48, quoting *New York* v. *United States,* 342 U.S. 882, 884 (1951) (Douglas, J., dissenting). It does no violence to the principles of deference to conclude that the commissioner lacked substantial evidence to bring his expertise into play in this situation.

*4. Conclusion.* The standard of review I have advanced would not unduly restrict rule making, nor would it place this

---

[8] It was also open to the commissioner to include in the regulation a restriction similar to the commitment made by ADL.

court in the position of determining the appropriateness of any particular rule. Instead, the court's task would be simply to ensure that administrative bodies act in a manner that is both consistent with statutory policy and reasonably related to life in the real world, rather than some conjectured life in the fictional twilight zone of what is "conceivable."

It is worth bearing in mind that "the knowledge of an administrative agency is rarely complete, an administrative agency is not ordinarily a representative body, its deliberations are not usually conducted in public, and its members are not subject to direct political controls in the same way as are legislators." Bonfield, The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process, 60 Iowa L. Rev. 731, 845 (1975). Or as one noted writer has said of independent agencies: "They have been founded on a basically undemocratic concept of the political process and have helped perpetuate naive notions about regulation, . . . the virtues of group decision and the use of expertness." M. Bernstein, Regulating Business By Independent Commission 294 (1955). Because of these considerations, we should abandon the principle that the court "should cast about to discover" any ground on which to uphold administrative action. *Cotter* v. *Chelsea,* 329 Mass. 314, 318 (1952). For "[w]hen a court declines to scrutinize (or even assumes the existence of) supporting facts, ignores the presence of alternatives, and requires nothing more than minimally rational explanation, almost any outcome can pass muster." Garland, Deregulation and Judicial Review, 98 Harv. L. Rev. 507, 556 (1985). The result here is, therefore, "one more step toward agency nonaccountability and carte blanche." *American Grain Prods. Processing Inst.* v. *Department of Pub. Health, supra* at 332 (Lynch, J., dissenting). At some point this process must stop.